HOLT'S CIGAR COMPANY, INC., Black Cat Cigar Company, Altadis USA, Inc., Swisher International, Inc., John Middleton, Inc., Cigar Association of America, Inc., and Pennsylvania Distributors Association, Inc.

v.

The CITY OF PHILADELPHIA and Robert D. Solvibile, in His Official Capacity As Acting Commissioner of the Department of Licenses and Inspections of the City of Philadelphia,

Appeal of: The City of Philadelphia and Robert D. Solvibile.

Commonwealth Court of Pennsylvania.

Argued Oct. 31, 2007.

Decided June 23, 2008.

Reargument Denied Aug. 15, 2008.

Jane Lovitch Istvan, Philadelphia, for appellants.

Mark A. Aronchick and John S. Stapleton, Philadelphia, for appellees.

BEFORE: LEADBETTER, President Judge, COLINS, Judge*, McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.[1]

The City of Philadelphia and Robert D. Solvibile, Acting Commissioner of the City's Department of Licenses and Inspections (collectively, the City), appeal an order of the Court of Common Pleas of Philadelphia County (trial court) invalidating a City ordinance that prohibits the sale of certain tobacco products that can be used as drug paraphernalia to ingest marijuana and other illegal drugs. The trial court found that the City's ordinance was preempted by the drug paraphernalia provisions of The Controlled Substance, Drug, Device and Cosmetic Act (Controlled Sub-

---

\* The decision in this case was reached after the date that Judge Colins assumed the status of senior judge.

1. This case was reassigned to this author on February 12, 2008.

stance Act).[2] Accordingly, the trial court granted summary judgment to Holt's Cigar Company, Inc., Black Cat Cigar Company, Altadis USA, Inc., Swisher International, Inc., John Middleton, Inc., Cigar Association of America, Inc. and Pennsylvania Distributors Association, Inc. (collectively, Holt's Cigar). Concluding that the trial court erred in holding all provisions of the City's ordinance to be preempted, we affirm in part and reverse in part.

On January 23, 2007, Philadelphia City Council amended the Philadelphia Code with the enactment of Ordinance No. 060345–AAA (Ordinance). The Ordinance was passed in response to the practice of drug users to replace the tobacco in cigarettes and cigars with marijuana and other illegal drugs. The Ordinance consists of two provisions. The first provision, entitled "Cigarettes and Tobacco Products," makes it unlawful for a retail business to sell a tobacco product in a way that makes it likely the product will be used to inhale controlled substances,[3] as, for example, the sale of a single cigarette. The second provision, entitled "Drug Paraphernalia, Blunt Cigars and Similar Items," prohibits retail businesses from selling certain tobacco drug paraphernalia,[4] such as "blunts." A violation of either provision of the Ordinance is punishable by a civil penalty of $1,900, for each violation committed during calendar year 2008, and by a civil penalty of $2,000 for each violation committed thereafter. In addition, a retail business may also be sanctioned by a revocation of its business privilege license.[5]

On January 30, 2007, Holt's Cigar filed a complaint seeking declaratory and injunctive relief. Holt's Cigar asserted that because the Ordinance effected a *per se* ban on the sale of certain products, it was preempted by the Controlled Substance Act, which requires a finding of intent to use an item to ingest illegal drugs before that item can be found to be drug paraphernalia.[6] Holt's Cigar challenged the entire Ordinance as preempted by the Controlled Substance Act.[7]

On March 9, 2007, the trial court held that the Ordinance was preempted and unenforceable.[8] The trial court lauded

2. Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §§ 780–101–780–144. The drug paraphernalia provisions were added by the Act of December 4, 1980, P.L. 634, 35 P.S. §§ 780–102, 780–113, 780–141.1.

3. Sections 9–622(5)(a)(.1) and (.4) of the Ordinance, THE PHILADELPHIA CODE §§ 9–622(5)(a)(.1), (.4). These sections are discussed more fully *infra.*

4. Sections 9–629(1) and (2) of the Ordinance, THE PHILADELPHIA CODE §§ 9–629(1), (2). These sections are discussed more fully *infra.*

5. *See* THE PHILADELPHIA CODE §§ 9–622(6)(f), 9–629(4).

6. The six count complaint asserted the following claims: that sections 9–622(5)(a)(.1), 9–622(5)(a)(.4), and 9–629 of the Ordinance are preempted by the Controlled Substance Act; that the Ordinance is preempted by 18 Pa. C.S. § 6305 (sale of tobacco to minors) and 53 P.S. § 301 (preempting subject matter of 18 Pa.C.S. § 6305); violation of due process rights under the United States Constitution and the Pennsylvania Constitution; and both overbroad and void for vagueness in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 1 of the Pennsylvania Constitution.

7. On March 7, 2007, the trial court enjoined the enforcement of the Ordinance for a period of 45 days beginning January 31, 2007. Thereafter, the parties stipulated to submit the case on the pleadings and certain stipulated facts and documents.

8. Although the complaint sought relief on other grounds, the trial court did not address these additional claims because it ruled in favor of Holt's Cigar on the basis of preemption.

the goal of the Ordinance but concluded that it could not be upheld because it

> converts a specific intent offense into a strict liability one, subjecting legitimate businesses selling legal dual-use products to the arbitrary enforcement of the City of Philadelphia Department of Licenses and Inspections.

Trial Court Opinion, dated March 9, 2007, at 9. The trial court concluded that strict liability was inconsistent with the *scienter* requirement of the Controlled Substance Act and, thus, preempted. The present appeal followed.[9]

Before this Court, the City argues that the trial court erred. It asserts that the Ordinance was the result of an appropriate exercise of the City's police power that is not prohibited by the Controlled Substance Act. The City also argues that, even assuming that a showing of *scienter* is required, part of the Ordinance does contain a *scienter* requirement and, therefore, should not have been invalidated.

■ We begin with a review of the standards for determining whether a local ordinance is preempted by a state statute. This Court applies the following five-part test to determine whether an ordinance has been preempted:

(1) Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is, does the ordinance forbid what the legislature has permitted?

(2) Was the state law intended expressly or impliedly to be exclusive in the field?

(3) Does the subject matter reflect a need for uniformity?

(4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?

(5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature?

*Liverpool Township v. Stephens*, 900 A.2d 1030, 1033 (Pa.Cmwlth.2006). If the answer to one of these questions is in the affirmative, then the local ordinance will be found preempted by the state statute. *Id.* As reflected in this five-part test, state preemption takes on three forms, which are commonly known as "express preemption," "field preemption," and "conflict preemption." *See Nutter v. Dougherty*, 595 Pa. 340, 938 A.2d 401, 404 (2007).

The preemption analysis with respect to a home rule municipality, such as the City of Philadelphia, is somewhat modified. In *Nutter*, our Supreme Court explained that a home rule municipality's exercise of authority should not be lightly intruded upon. *Id.* at 361–62, 938 A.2d at 414. Accordingly, ambiguities about the scope of the municipality's authority should be resolved in the municipality's favor. *Id.* at 355–57, 938 A.2d at 411. However, the Pennsylvania Supreme Court also observed that a home rule municipality's authority can be limited by its own home rule charter, by the Pennsylvania Constitution, and by the General Assembly.[10] *Id.* Stat-

---

9. Our scope of review in a declaratory judgment action is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court committed an error of law or abuse of discretion. *City of Pittsburgh v. Bachner*, 912 A.2d 368, 372 n. 6 (Pa.Cmwlth.2006).

10. In *Nutter*, the Pennsylvania Supreme Court affirmed this Court's holding that a Philadel-

phia ordinance that limited campaign contributions to candidates for municipal office was not preempted by the Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600–3591. The Supreme Court reasoned that the Election Code was *silent* on the issue of campaign contribution limits and, thus, left the field open to locally tailored restrictions such as those contained in the ordinance that

ed otherwise, home rule municipalities do not enjoy a general power to legislate in a way that contradicts a state statute.

In this case, the City argues that the Ordinance does not conflict with the Controlled Substance Act but, rather, is consistent with Section 41.1 of the Controlled Substance Act, which expressly authorizes local regulation. It states, in relevant part, as follows:

> Nothing in this act relating to drug paraphernalia shall be deemed to supersede or invalidate any consistent local ordinance, *including zoning and nuisance ordinances,* relating to the possession, sale or use of drug paraphernalia.

35 P.S. § 780–141.1 (emphasis added). The City argues that the Ordinance simply expands the protections of the Controlled Substance Act without conflicting with it, and this expansion is permissible.[11] In short, the City believes that the Ordinance is not preempted under the *Liverpool Township* criteria.

We consider, first, the provisions of the Controlled Substance Act that were found by the trial court to supersede the Ordinance. Section 13(a)(33) prohibits the knowing manufacture or delivery of drug paraphernalia items; it states as follows:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

\* \* \*

(33) The delivery of, possession with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, *knowing, or under circumstances where one reasonably should know,* that it would be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of this act.

35 P.S. § 780–113(a)(33) (emphasis added). The Act generally defines "drug paraphernalia," to mean "products and materials ... which are used ... [in] manufacturing, ... ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act." Section 2 of the Controlled Substance Act, 35 P.S. § 780–102. Contained in the Section 2 definition of "drug paraphernalia" is a long list of items ranging from scales and balances to cocaine spoons, roach clips and

---

are sensitive to the peculiarities of the particular municipality.

11. In support, the City relies on cases that reflect a strong deference to home rule and police authority by permitting a municipality to *add or broaden* the protections of a statute. However, in those cases, none of the ordinances at issue forbid what the legislature permitted. *See, e.g., Hartman v. City of Allentown,* 880 A.2d 737 (Pa.Cmwlth.2005) (finding that the Pennsylvania Human Relations Act, Act of October 27, 1995, P.L. 744, *as amended,* 43 P.S. §§ 951–963, did not prevent the City of Allentown from adding the category of sexual orientation to the forms of discrimination prohibited under the City's Human Relations Ordinance); *Muehlieb v. City*

*of Philadelphia,* 133 Pa.Cmwlth. 133, 574 A.2d 1208 (1990) (finding that the State Dog Law, Act of December 7, 1982, P.L. 784, *as amended,* 3 P.S. §§ 459–101–551, allowing individuals with a private kennel license to house up to fifty dogs did not preempt the City of Philadelphia from limiting the number of dogs that one may keep at a residential dwelling to twelve); *Department of Licenses and Inspections v. Weber,* 394 Pa. 466, 147 A.2d 326 (1959) (finding that the State Beauty Culture Act, Act of May 3, 1933, P.L. 242, 63 P.S. §§ 507–527, did not preempt the City of Philadelphia from imposing additional fire and sanitary requirements in an ordinance regulating beauty parlors).

bongs that constitute drug paraphernalia because they are intended for use in ingesting drugs.[12]

Because the list of items that can be used to manufacture or ingest illegal drugs is as long as the reach of human imagination, the list of drug paraphernalia items in Section 2 is not intended to be complete. Any item can be determined to be "drug paraphernalia," and Section 2 explains how this determination should be made. It states:

In determining whether an object is drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors, [1] statements by an owner or by anyone in control of the object concerning its use, [2] prior convictions, if any, of an owner, or of anyone in control of the object, under any State or Federal law relating to any controlled substance, [3] the proximity of the object, in time and space, to a direct violation of this act, [4] the proximity of the object to controlled substances, [5] the existence of any residue of controlled substances on the object, [6] *direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliv-*

12. Section 2 states that "drug paraphernalia" includes but is not limited to:

(1) Kits used, intended for use or designed for use in planting, propagating, cultivating, growing or harvesting of any species of plant which is a controlled substance or from which a controlled substance can be derived.

(2) Kits used, intended for use or designed for use in manufacturing, compounding, converting, producing, processing or preparing controlled substances.

(3) Isomerization devices used, intended for use or designed for use in increasing the potency of any species of plant which is a controlled substance.

(4) Testing equipment used, intended for use or designed for use in identifying or in analyzing the strength, effectiveness or purity of controlled substances.

(5) Scales and balances used, intended for use or designed for use in weighing or measuring controlled substances.

(6) Diluents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose and lactose, used, intended for use or designed for use in cutting controlled substances.

(7) Separation gins and sifters used, intended for use or designed for use in removing twigs and seeds from or in otherwise cleaning or refining marihuana.

(8) Blenders, bowls, containers, spoons and mixing devices used, intended for use or designed for use in compounding controlled substances.

(9) Capsules, balloons, envelopes and other containers used, intended for use or designed for use in packaging small quantities of controlled substances.

(10) Containers and other objects used, intended for use or designed for use in storing or concealing controlled substances.

(11) Hypodermic syringes, needles and other objects used, intended for use, or designed for use in parenterally injected controlled substances into the human body.

(12) Objects used, intended for use or designed for use in ingesting, inhaling or otherwise introducing marihuana, cocaine, hashish or hashish oil into the human body, such as:

(i) Metal, wooden, acrylic, glass, stone, plastic or ceramic pipes with or without screens, permanent screens, hashish heads or punctured metal bowls.

(ii) Water pipes.

(iii) Carburetion tubes and devices.

(iv) Smoking and carburetion masks.

(v) Roach clips; meaning objects used to hold burning material such as a marihuana cigarette, that has become too small or too short to be held in the hand.

(vi) Miniature cocaine spoons and cocaine vials.

(vii) Chamber pipes.

(viii) Carburetor pipes.

(ix) Electric pipes.

(x) Air-driven pipes.

(xi) Chillums.

(xii) Bongs.

(xiii) Ice pipes or chillers.

35 P.S. § 780–102.

er it to persons who he knows, or should reasonably know, intend to use the object to facilitate a violation of this act, [7] the innocence of an owner or of anyone in control of the object, as a direct violation of this act should not prevent a finding that the object is intended for use or designed for use as drug paraphernalia, [8] instructions, oral or written, provided with the object concerning its use, [9] descriptive materials accompanying the object which explain or depict its use, [10] national and local advertising concerning its use, [11] the manner in which the object is displayed for sale, [12] whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products, [13] direct or circumstantial evidence of the ratio of sales of the objects to the total sales of the business enterprise, [14] the existence and scope of legitimate uses for the object in the community, and [15] expert testimony concerning its use.

35 P.S. § 780–102 (emphasis added). In short, whether specifically listed in Section 2 or not, an item is determined unlawful drug paraphernalia only after the court or other authority applies the above quoted, 15–part test.[13]

We turn, next, to the Ordinance found by the trial court to be preempted by Section 13(a)(33) of the Controlled Substance Act. Section 9–622(5)(a) of the Ordinance forbids the retail sale of certain tobacco products that could be used to ingest illegal drugs. It states, in relevant part, as follows:

(5) Retail Businesses

(a) It shall be unlawful for any retail business to sell or furnish by gift, purchase, or other means any of the following:

(.1) *Any cigarette, cigar, tiparillo, cigarillo or other tobacco product, singly or in packages of fewer than three or other than in the* package, box, carton or other container provided by the manufacturer, importer or packager which bears a health warning required by federal law, *except that hotels, restaurants that seat at least 25 patrons, and specialty tobacco stores* (as defined in Section 9–622(4)) may sell in small quantities cigars for which the retail price is at least one dollar ($1) per cigar;

\* \* \*

(.4) any flavored tobacco item including any flavored cigarette, cigar, tiparillo, cigarillo or other tobacco product, *except that* the term "tobacco product" *shall not include a package of loose tobacco, snuff, chewing tobacco, dipping tobacco, or pipe tobacco,* where the package is that provided by the manufacturer, importer or packager which bears a health warning required by federal law, *and provided* that this subsection (.4) shall not apply to *cigarettes in packages of 20 or more included in the directory published pursuant to Section 301 of the Pennsylvania Tobacco Product Manu-*

---

**13.** The dissent of Judge Cohn–Jubelirer argues that "other authority" includes a municipality acting in a quasi-legislative capacity. This is not likely because the "determination" discussed at length in Section 2 is particular not general; it relates to one "object." Ac- cordingly, the determination to be made is a quasi-adjudicative determination or quasi-prosecutorial determination, not a quasi-legislative determination. The "other authority" could be a district magistrate, a prosecutor or a court.

facturer Directory Act, 35 P.S. Section 5702.301.

Philadelphia Code §§ 9–622(5)(a)(.1), (.4) (emphasis added). Thus, under Section 9–622(5)(a)(.1), it is unlawful for *any* retail business to sell tobacco products, singly or in small quantities, although certain hotels and restaurants are exempted. Under Section 9–622(5)(a)(.4), it is unlawful for *any* retail business to sell a flavored tobacco product, although chewing or pipe tobacco products and cigarettes sold in quantities of twenty or more are exempt from this ban.

It is not clear what retail businesses and products are left after the exemptions in Section 9–622(5)(a) are applied. Nevertheless, the non-exempt retail business can be held liable even if it does not know that the sale of a single cigarette or flavored cigar will result in the buyer using the tobacco product to inhale illegal drugs. By contrast, the Controlled Substance Act exempts persons from liability who do not know, or cannot reasonably know, that the tobacco item being sold would be used by the buyer to ingest illegal drugs. Because Section 9–622(5)(a)(.1) and Section 9–622(5)(a)(.4) of the Ordinance prohibit the sale of a single cigarette or flavored cigar even if the retail business proprietor or employee has no idea that the item will be used to ingest illegal drugs, these provisions are preempted. The strict liability standard in the Ordinance conflicts with the *scienter* requirement in the Controlled Substance Act.

Next, we consider Section 9–629(1)(a) of the Ordinance, which prohibits the sale of certain tobacco drug paraphernalia known as "blunts" by anyone. It states, in relevant part, as follows:

(1) It shall be unlawful for any person, including any retail business, to sell or offer for sale any of the following:

(a) Any item that constitutes drug paraphernalia, as that term is defined in the Pennsylvania Controlled Substances, Drug, Device and Cosmetic Act, 35 P.S. § 780–102, *where the seller knows, or under the circumstances reasonably should know,* that it would be used to convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of that Act, especially any of the following:

\* \* \*

(.2) *Objects used, intended for use* or designed for use in ingesting, inhaling or otherwise introducing marihuana, cocaine, hashish or hashish oil into the human body, such as:

(.a) Cigars sold singly, flavored cigars known as "blunts," unflavored "blunts," flavored and unflavored blunt wraps, cigarette rolling papers, cigarillos, and tiparillos;

THE PHILADELPHIA CODE § 9–629(1)(a) (emphasis added). In short, Section 9–629(1)(a) prohibits the sale of drug paraphernalia, especially blunts, if the seller knows or should know, that the blunt will be used to ingest drugs.

Section 9–629(1) of the Ordinance simply expands the Section 2 list of discrete items identified by the legislature as "drug paraphernalia" to include certain tobacco products as additional items. It does so by incorporating Section 2 of the Controlled Substance Act into the Ordinance, which itself requires that the person charged with selling tobacco products as drug paraphernalia understand its intended use is to ingest illegal drugs. Incorporating Section 2 is enough to require *scienter*, but Section 9–629(1) then repeats

the requirement that "the seller knows" how the "blunt" will be used. Thus, Section 9–629(1) of the Ordinance twice states a *scienter* requirement. Because Section 9–629(1) is local legislation "consistent" with the Controlled Substance Act, it is expressly authorized and saved from pre-emption by Section 41.1 of the Controlled Substance Act, 35 P.S. § 780–141.1.

Finally, we examine Section 9–629(2) of the Ordinance, which forbids the sale of the proscribed tobacco products within 500 feet of a school or church. It states as follows:

> (2) It shall be unlawful for any person, including any retail business, to sell or offer for sale within five hundred (500) feet of a school, recreation center, day care center, church, or community center any of the items identified in either Section 9–622(5) or Section 9–629(1), *regardless of the intent as to use of the item.*

THE PHILADELPHIA CODE § 9–629(2) (emphasis added). Thus, Section 9–629(2) sets up an absolute 500–foot barrier between the sale of a single or flavored cigarette (Section 9–622(5)) or a blunt (Section 9–629(1)) and a school, church or day care center. We believe Section 9–629(2) is saved from preemption by Section 41.1 of the Controlled Substance Act, which states that it is not intended to supersede "any consistent local ordinance, including zoning and nuisance ordinances...." 35 P.S. § 780–141.1.

First, zoning legislation will not be found preempted by a state regulatory statute unless that statute expressly states an intention to preempt zoning. *See, e.g.,*

*Greene Township v. Kuhl,* 32 Pa.Cmwlth. 592, 379 A.2d 1383, 1385 (1977) (stating that this Court must follow the mandate of a zoning ordinance in the absence of a clear intent of the legislature to override a local zoning ordinance). By contrast, here, the General Assembly has stated an express intent to save "zoning and nuisance ordinances." Section 41.1 of the Controlled Substance Act, 35 P.S. § 780–141.1. There can be little doubt that Section 9–629(2) is a zoning or nuisance ordinance. In *Municipality of Monroeville v. Chambers Development Corp.,* 88 Pa.Cmwlth. 603, 491 A.2d 307, 310 (1985), this Court explained that an ordinance requiring a "buffer zone around a proposed hazardous waste disposal facility" was a zoning ordinance.[14] Likewise, Section 9–629(2) seeks to place a buffer zone between those attending a church service, a school day or a community center event from having to observe a blunt sale, whether taking place inside a store or on the sidewalk.[15] The main purpose of Section 9–629(2) is to create a buffer, not to restrict drug use; stated otherwise, it governs the placement of certain tobacco sales. This Court has also explained that zoning concerns the placement of an activity as opposed to the conduct of that activity. *Liverpool,* 900 A.2d at 1036.

Second, because Section 9–629(2) is either a zoning or nuisance ordinance, or both, it is a type of consistent ordinance saved by Section 41.1 of the Controlled Substance Act. The General Assembly has instructed that the Controlled Substance Act is not intended "to supersede or invalidate any consistent local ordinance,

---

**14.** The dissent of Judge Friedman asserts that Section 9–629(2) must be included within the City's zoning ordinance in order to meet the exemption in Section 41.1 of the Controlled Substance Act. It is the impact of the local legislation, not its location in the municipal

code, that is determinative of whether it is a zoning or nuisance ordinance.

**15.** Indeed, the City can forbid any number of lawful sales in a 500–foot zone in the interest of public health and safety concerns.

including zoning and nuisance ordinances ..." Section 41.1 of the Controlled Substance Act, 35 P.S. 780–141.1. The legislature has identified zoning and nuisance ordinances as types of "consistent" ordinances allowed; otherwise, the reference to zoning and nuisance ordinances would be redundant. Indeed, a zoning ordinance that also indirectly limits the distribution of drug paraphernalia is consistent with the goal of the Controlled Substance Act.[16] Finally, if there is any doubt about the meaning of Section 41.1 of the Controlled Substance Act, our Supreme Court has directed that ambiguities about the scope of a home rule municipality's authority should be resolved in favor of the municipality. *Nutter*, 595 Pa. at 355–57, 938 A.2d at 411.

Section 9–629(2) does not require a showing of *scienter*. However, it is a type of zoning or nuisance ordinance that is expressly saved from preemption by Section 41.1 of the Controlled Substance Act.

Based on the foregoing, we affirm the trial court with respect to Sections 9–622(5)(a)(.1) and (.4) of the Ordinance, and we reverse the trial court with respect to Sections 9–629(1) and 9–629(2) of the Ordinance.

Judge McGINLEY dissents.

### ORDER

AND NOW, this 23rd of June, 2008, the order of the Court of Common Pleas of Philadelphia County, dated March 9, 2007, in the above-captioned matter is AFFIRMED in part and REVERSED in part in accordance with this opinion.

## CONCURRING AND DISSENTING OPINION BY Judge FRIEDMAN.

I concur in part and dissent in part from the majority's decision. I agree with the majority that: (1) sections 9–622(5)(a)(.1) and 9–622(5)(a)(.4) of Ordinance No. 060345–AAA (Ordinance) prohibit the sale of identified tobacco products without regard to the seller's knowledge as to whether such products will be used to ingest illegal drugs; (2) the "strict liability standard in the Ordinance," (majority op. at 11), conflicts with the *scienter* requirement contained in section 13(a)(33) of The Controlled Substance, Drug, Device and Cosmetic Act (Act);[1] and (3) because sections 9–622(5)(a)(.1) and 9–622(5)(a)(.4) conflict with the Act, these provisions of the Ordinance are preempted by state law.[2]

---

**16.** It is possible that a zoning ordinance that required stores to sell blunts would be inconsistent with the Controlled Substance Act, but that is not the case before us.

**1.** Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. § 780–113(a)(33). In relevant part, this section prohibits the delivery of, the possession with intent to deliver or the manufacture with intent to deliver drug paraphernalia, *knowing, or under circumstances where one reasonably should know*, that it would be used to ingest, inhale or otherwise introduce a controlled substance into the human body in violation of the Act. *Id.*

**2.** I agree that sections 9–622(5)(a)(.1) and 9–622(5)(a)(.4) of the Ordinance conclusively establish that specified items, including cigars sold singly and all flavored cigars, constitute drug paraphernalia *per se*. (*See* Judge Cohn Jubelirer's concurring and dissenting op. at 1213; majority op. at 1205–06.) However, I cannot agree that the Ordinance's explicit identification of these items as drug paraphernalia obviates the need for a *scienter* requirement as is contained in the Act, (Judge Cohn Jubelirer's concurring and dissenting op. at 1216–17). Respectfully, I suggest that Judge Cohn Jubelirer's concurring and dissenting opinion overlooks the fact that the items

I also agree that, *as interpreted by the majority,* section 9–629(1) of the Ordinance is not preempted by the Act. Section 9–629 of the Ordinance is titled "Drug paraphernalia, blunt cigars and similar items," and section 9–629(1) provides in part as follows:

(1) It shall be unlawful for any person, including any retail business, to sell or offer for sale any of the following:

(a) Any item that constitutes drug paraphernalia, *as that term is defined in the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act,* 35 P.S. § 780–102, where the seller knows, or under the circumstances reasonably should know, that it would be used to ... introduce into the human body a controlled substance in violation of that Act, especially any of the following:

(.1) Containers ... used, intended for use or designed for use in packaging small quantities of controlled substances, as well as cigars, cigarettes and related items intended for use in concealing or holding such substances;

(.2) Objects used, intended for use or designed for use in ingesting, inhaling or otherwise introducing marihuana, cocaine, hashish or hashish oil into the human body, such as:

(.a) Cigars sold singly, flavored cigars known as "blunts," flavored and unflavored blunt wraps, cigarette rolling papers, cigarillos, and tiparillos; ....

The Philadelphia Code (Code) § 9–629(1) (emphasis added).

The majority concludes that, because section 9–629(1) of the Ordinance incorporates the definition of "drug paraphernalia" contained in section 2 of the Act, 35 P.S. § 780–102, section 9–629(1)(a) prohibits the sale of cigars sold singly, blunts, and the other specified items *only if* the seller knows or should know that the item will be used to ingest drugs. Under this interpretation, section 9–629(1) of the Ordinance does not conflict with the Act.

However, in light of the record testimony, as well as representations to this court at oral argument and in the City's brief,

deemed to be drug paraphernalia by the Ordinance are legal products sold by legitimate businesses.

The Act recognizes that many legal products, including scales, blenders, bowls and even balloons, can be drug paraphernalia *if* they are products "which are used, intended for use or designed for use in ... processing, preparing ... ingesting, inhaling or otherwise introducing into the human body a controlled substance" in violation of the Act. Section 102 of the Act, 35 P.S. § 780–102. By repeating the phrase "used, intended for use or designed for use" thirteen times, and by setting forth a fifteen-part test to determine whether such legal products constitute drug paraphernalia, (*see* majority op. at 9), the Act reflects the General Assembly's awareness that *"all equipment, products and materials of any kind"* can constitute drug paraphernalia, if they are so used, are intended for such use or are designed for such use. 35 P.S. § 780–102 (emphasis added). I believe that the same language also reflects the General Assembly's

intent to protect legitimate businesses selling legal products where the unlawful use or intended unlawful use of these products is not established.

I do not disregard the fact that the deliberate omission of a *scienter* requirement in the Ordinance is part of the City's pursuit of a laudable goal: to reduce drug use and the injurious effects of drug use on the community and on children in particular. Nor do I disregard the fact that the manner in which the City addresses this emotionally charged issue impermissibly converts a specific intent offense into a strict liability offense, thereby subjecting legitimate businesses selling legal dual-use products to the arbitrary enforcement of the City's Department of Licenses and Inspections. Simply put, Ordinance sections 9–622(5)(a)(.1) and 9–622(5)(a)(.4) forbid that which is permitted by state law. For that reason, in my view, sections 9–622(5)(a)(.1) and 9–622(5)(a)(.4) of the Ordinance conflict with and are preempted by the Act.

there can be no doubt that the City *intends* this Ordinance to *"dispens[e] with* the onerous requirement of proof that the seller knew that the buyer intended to utilize the item to ingest illegal drugs."[3] (City's brief at 16–17) (emphasis added). Therefore, I would emphasize that, to the extent that the City interprets section 9–629(1) of the Ordinance as *excluding a scienter* requirement, such interpretation would be in conflict with the Act and render this provision of the Ordinance unenforceable.

Although I concur in part with the majority's decision, unlike the majority, I believe that the trial court correctly held that section 9–629(2) of the Ordinance, which *expressly excludes any consideration of intent,* conflicts with and is preempted by the Act. In reaching a contrary conclusion, I believe that the majority disregards the five-part analysis Pennsylvania courts apply to determine whether an ordinance is preempted by a state law. *See Liverpool Township v. Stephens,* 900 A.2d 1030 (Pa.Cmwlth.2006).

Ordinance section 9–629(2) provides as follows:

(2) It shall be unlawful for any person, including any retail business, to sell or offer for sale within five hundred (500) feet of a school, recreation center, day care center, church, or community center any of the items identified in either Section 9–622(5) or Section 9–629(1), *regardless of the intent* as to the use of the item.

Code § 9–629(2) (emphasis added). The majority acknowledges that this provision does not require a showing of *scienter.* However, the majority concludes that section 9–629(2) of the Ordinance is saved from preemption by section 41.1 of the Act.[4] I disagree.

Section 41.1 of the Act states that *"consistent* local ordinance[s], including zoning and nuisance ordinances" are not superseded or invalidated by the Act. 35 P.S. § 780–141.1 (emphasis added). The majority reasons that section 9–629(2) of the Ordinance must be found consistent with the Act because it is a zoning ordinance. According to the majority:

(1) the main purpose of section 9–629(2) is to shield children and churchgoers from "having to observe a blunt sale;" (majority op. at 1207.)

(2) section 9–629(2) creates a 500–foot barrier between the sale of specified tobacco products and schools, churches and day-care centers;

(3) pursuant to *Municipality of Monroeville v. Chambers Development Corporation,* 88 Pa.Cmwlth. 603, 491 A.2d 307 (1985), because section 9–629(2) cre-

---

**3.** The Ordinance refers to the Act's "definition" of drug paraphernalia, but it omits any reference to the fifteen factors that, according to the Act, a court should consider when determining whether an item falls within that definition. As the trial court observed, inclusion of these factors reflects the General Assembly's intent to protect legitimate businesses selling legal products. Because the City's *acknowledged purpose* in enacting the Ordinance is to avoid having to prove a seller's knowledge of the intended use of the specified items, I submit that the exclusion of the fifteen factors from section 9–629(1) of the Ordinance reflects the City's intent to recog-

nize single cigars, blunts and other specified items as drug paraphernalia *per se.*

Moreover, to the extent this is true, I question why the City would consider a cigar sold singly to be drug paraphernalia *per se* but would not consider cigars sold in quantity to be drug paraphernalia *per se.* Certainly the effect of the Ordinance is unduly burdensome to those members of society who cannot afford to purchase more than one cigar at a time.

**4.** Added by section 4 of the Act of December 4, 1980, P.L. 1093, 35 P.S. § 780–141.1.

ates a buffer zone, it is a zoning ordinance;

(4) section 41.1 of the Act expressly permits "consistent local ordinances, including zoning and nuisance ordinances;"

(5) by this language, the legislature has identified zoning ordinances as a type of consistent ordinance allowed by the Act; and

(6) because it is a zoning ordinance, section 9–629(2) is saved from preemption by section 41.1 of the Act.

Initially, I disagree with the majority that the "main purpose of Section 9–629(2)" is to shield children and churchgoers from "having to observe a blunt sale . . . not to restrict drug use." (Majority op. at 1207.)   Contrary to the majority's assertion, the record evidence allows no room for doubt that the only goal of the Ordinance is to combat drug use.[5]   In addition, the majority fails to explain how the mere sight of a cigar sale can have a deleterious effect on children and/or churchgoers.   Moreover, I cannot comprehend how the sale of a blunt or a single cigar could be more injurious to the health or sensibilities of children and churchgoers than the sale of *multiple cigars* and other tobacco products, which is not prohibited under section 9–629(2).

5.  *See* transcript of the October 26, 2006, session of the City Council Committee on Licenses and Inspections, R.R. at 86a–171a.  *See also* Bill No. 060345–AAA, adopting the Ordinance and stating that its provisions were added to Chapter 9–600 of the Code *"to prohibit the sale . . . of 'blunts,' 'loosies,' cigarette papers, cigars and other items that may be otherwise legal but that are commonly used as drug paraphernalia. . . ."* (Bill No. 060345–AAA at 1.)

6.  I do agree that, in general, an ordinance that purposefully creates a buffer zone in the interest of public health and safety is likely a zoning ordinance; however, I disagree that section 9–629(2) of the Ordinance is such a provision.

I also disagree "[t]hat there can be little doubt that Section 9–629(2) is a zoning or nuisance ordinance." (Majority op. at 1207.)   In addition to the stated purpose of the Ordinance and the testimony of record, the placement of Ordinance section 9–629(2) in Title 9 of the Code supports a contrary conclusion.   Title 9 of the Code contains the City's regulation of businesses, trades and professions, whereas the City's zoning regulations are contained in Title 14 (Zoning and Planning).   The majority suggests that this is of no moment, but the Code reflects that the city council makes distinctions between the regulation of conduct and the regulation of location.   For example, the Code regulates "adult bookstores" in both Title 9 *and* Title 14.   Section 9–624(b) of the Code provides that, "regulations *in addition to those contained in existing zoning regulations* are necessary to reduce the nighttime hours during which adult bookstores operate" and *specifically restricts the hours of operation of business that are located within 1000 feet of specified places.*   It is section 14–1605, however, which prohibits an adult bookstore from being located within 500 feet of churches and schools.   Thus, where the Code intends to create a buffer zone, the regulation is included in Title 14's zoning regulations.[6]

In concluding otherwise, the majority misinterprets our decision in *Municipality of Monroeville v. Chambers Development Corporation*, 88 Pa.Cmwlth. 603, 491 A.2d 307 (1985), as a case which "explained that an ordinance requiring a 'buffer zone' . . . was a zoning ordinance." (Majority op. at 1207.)   This case includes no such explanation.   The issue in *Municipality of Monroeville* was whether, through the Solid Waste Management Act, Act of July 7, 1980, P.L. 380, 35 P.S. §§ 6018.101–6018.1003, the state had preempted the regulation of landfill operations.   The only reference to a "buffer zone" in *Municipality of Monroeville* is contained in its discussion of another case, which "involved a zoning ordinance requiring a buffer

I also note the Code contains numerous provisions wherein a particular activity or condition is deemed to be a "nuisance";[7] however, in contrast to those provisions, there is no similar language in the Ordinance. Because there is no evidence indicating that the City intended the Ordinance, or any part of it, to be a zoning or nuisance regulation, I disagree with the majority's conclusion in this regard.

More important, although the majority acknowledges that section 41.1 of the Act specifically allows any "*consistent* local ordinance, including zoning and nuisance ordinances," 35 P.S. § 780–141.1 (emphasis added), the majority construes this language as identifying *every* zoning and nuisance ordinance as being a type of ordinance that is consistent with the Act. Under the majority's analysis, *every zoning ordinance is consistent with the Act as a matter of law.* I submit that this is an absurd result, one that can only be reached by ignoring the law governing preemption, and, in particular, the princi-

ple that "home rule municipalities are not generally authorized to legislate in a way that contradicts a state statute." (Majority op. at 1203.)[8]

Finally, I believe that the majority's statement that "zoning legislation will not be found preempted by a state regulatory statute unless that statute expressly states an intention to preempt zoning," (majority op. at 1207), confirms that the majority's analysis is flawed. The majority recognizes that state preemption can be found in three forms, which are commonly known as "express preemption," "field preemption" and "conflict preemption." The issue here involves' "conflict preemption,' which acts to preempt any local law that contradicts or contravenes state law." *Nutter v. Dougherty*, 595 Pa. 340, 346, 938 A.2d 401, 404. Clearly, the majority's statement that preemption will not be found unless a statute "expressly states an intention to preempt zoning" applies only to an analysis of "express preemption" and is not at all relevant here.[9] The issue here is

---

zone around a proposed hazardous waste disposal facility." *Municipality of Monroeville*, 491 A.2d at 310. The ordinance requiring a buffer zone was distinguished from the ordinance at issue in *Municipality of Monroeville* because the ordinance in *Municipality of Monroeville did not regulate the physical location* of a proposed landfill, but only regulated the hours and days of operation. Similarly, section 9–629(2) of the Ordinance does not regulate the *location* of any type of business but only regulates the manner in which they operate.

7. *See* e.g., section 9–608(1) (concerning real estate signs); section 9–305(4) (concerning false alarms); section 9–703 ("a nuisance shall include the sale of illegal drugs or paraphernalia on or about the premises" of a special assembly occupancy); section 10–11–1(1) (concerning obscenity); and section 14–2109 (relating to subdivisions).

8. The majority implicitly recognizes that a zoning ordinance *might not be consistent* with the Act. (*See* majority op. at 1208 n. 16.) To

the extent that the majority means to say that the Ordinance is a *type* of ordinance that *may* be saved from preemption by section 41.1 of the Act *if* it is consistent with the Act, then the necessary inquiry is whether the Ordinance's provisions conflict with the statute. Merely determining that the Ordinance is "a type" of ordinance that may be saved from preemption does not answer that question. In fact, such analysis treats the word "consistent" as mere surplusage.

9. Therefore, the majority's reliance on *Greene Township v. Kuhl*, 32 Pa.Cmwlth. 592, 379 A.2d 1383 (1977), which undertook an "express preemption" analysis, also is misplaced.

Importantly, the decision in *Nutter* specifically did not involve a "conflict preemption" analysis. Instead, the court made clear that the "conflict preemption" argument asserted on appeal "essentially sounds in field preemption rather than conflict preemption. Accordingly, the discussion collapses into *that single inquiry.*" *Nutter*, 595 Pa. at 358, 938 A.2d at 412 (emphasis added, footnote omitted). Be-

whether section 9–629(2) conflicts with the Act because it explicitly precludes the consideration of intent that the Act requires. I believe that it does, and, therefore, I would hold that, under the established principles of conflict preemption, section 9–629(2) of the Ordinance also is preempted by the Act.

Accordingly, I would affirm the trial court's decision in its entirety.

## CONCURRING AND DISSENTING OPINION BY Judge COHN JUBELIRER.

I concur with the majority that subsections (1) and (2) of Section 9–629 of The Philadelphia Code (Code) as modified by Ordinance No. 060345–AAA (Ordinance), are not preempted. However, because I would also find that subsections (5)(a)(.1) and (.4) of Section 9–622 of the Code as modified by the Ordinance, are not preempted, I must dissent from that portion of the majority's opinion that holds otherwise. In sum, The Controlled Substance, Drug, Device and Cosmetic Act (Act)[1] does not specifically identify any item as conclusively being "drug paraphernalia" and, therefore, does not identify any item as necessarily being impermissible to sell. Thus, the scienter provision of the Act is necessary to protect retailers and others who, given the Act's lack of precision, may genuinely be unsure as to whether an item they are selling is contraband. In contrast, the Ordinance specifically identified items that may not be sold, thus

leaving no doubt as to whether the items were contraband. The explicit nature of the prohibition obviates the need for scienter. The City of Philadelphia's (City) exercise of authority is consistent with the authority delegated by the General Assembly in the Act itself, and reserved by the City by its status as a home rule community.

The present case involves Section 41.1 of the Act.[2] The relevant language of the Act provides that "[n]othing in this act relating to drug paraphernalia shall be deemed to supersede or invalidate any *consistent local ordinance*, including zoning and nuisance ordinances, relating to the possession, sale or use of drug paraphernalia." 35 P.S. § 780–141.1 (emphasis added). The dispute is whether Section 9–622(5)(a)(.1) and (.4) of the Code is "consistent" with the Act.

The majority reasons that because Section 13(a)(33) of the Act, 35 P.S. § 780–113(a)(33), imposes a scienter requirement and that subsections (a)(.1) and (.4) of Section 9–622 of the Code do not, these subsections are inconsistent with the Act. Section 13(a)(33) reads in relevant part: "(a) [t]he following acts and the causing thereof within the Commonwealth are hereby prohibited: . . . . (33) The delivery of, possession with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, *knowing, or under circumstances where one reasonably should know*" that the item will be used to "manufacture . . . produce . . . prepare . . . pack, repack . . . contain,

cause *Nutter* expressly excluded the issue of conflict preemption from its analysis, it provides no authority for the proposition that a *conflicting* ordinance can be upheld as a valid exercise of a home rule municipality's powers. (*See* Judge Cohn Jubelirer's concurring and dissenting op. at 1217–19, concluding that the deferential standard set forth in *Nutter* requires this court to defer to the City's exercise of municipal powers.)

1. The Act of April 14, 1972, P.L. 233, added by Section 4 of the Act of December 4, 1980, P.L. 1093, *as amended*, 35 P.S. §§ 780–101– 780–144.

2. Added by Section 4 of the Act of December 4, 1980, P.L. 1093, *as amended*, 35 P.S. § 780–141.1

conceal ... ingest, inhale or otherwise introduce into the human body a controlled substance...." 35 P.S. § 780–113(a)(33) (emphasis added). The majority contrasts this language from the Act with the language from Section 9–622(5) of the Code, which does not include a scienter provision. This section of the Code, instead, reads "[i]t shall be unlawful for any retail business to sell or furnish by gift, purchase or other means any of the following...." Section 9–622(5) of the Code. The majority concludes that the Act "exempts persons from liability who do not know, or cannot reasonably know, that the tobacco item being sold would be used by the buyer to ingest illegal drugs" and that the Ordinance's lack of a similar provision is an irreconcilable conflict between the Ordinance and Act. *Holt's Cigar Company, Inc v. City of Philadelphia,* 952 A.2d 1199, 1206 (Pa.Cmwlth.2008), op. at 1205–06.

To fully appreciate the scienter requirement set forth in Section 13(a)(33) of the Act, one must examine Section 2 of the Act, 35 P.S. § 780–102. Section 2 is a definitional section that defines many terms, including "drug paraphernalia." As noted by the majority, the definition for "drug paraphernalia" has two components. The first component is an extensive list of items that the statute identifies as *sometimes* being "drug paraphernalia."[3] The list contains many items that may have innocuous uses, such as "[b]lenders, bowls, containers, [and] spoons...." 35 P.S. § 780–102. The list in the first component of the "drug paraphernalia" definition is not meant to be exhaustive. The second component of the definition is a delineation of criteria to consider when evaluating, under the facts and circumstances of a particular case, if an item listed in the first component of the definition, or any other item that is not listed, constitutes "drug paraphernalia." This list of criteria is, itself, not exhaustive, as the statutory language provides that "all other logically relevant factors" should also be considered. 35 P.S. § 780–102. Therefore, due to this second component, the evaluation of whether a given item is "drug paraphernalia" encompasses the totality of the circumstances.

The majority explicitly concludes that it is for a court to evaluate these factors and make this determination. *Holt,* 952 A.2d at 1205. ("In short, whether specifically listed in Section 2 or not, an item is determined unlawful drug paraphernalia only after the court applies the ... 15–part test.") If only a court may determine whether a given item is drug paraphernalia, it follows that such analysis may only be done on a case by case basis. Therefore, under such review, particularly when dealing with items that may have an innocuous use, the state of mind of the seller of the object is important. Indeed, one of the factors of the second component of the "drug paraphernalia" definition mentions for consideration the "direct or circumstantial evidence *of the intent of an owner,* or of anyone in control of the object, to deliver it to persons *who he knows, or should reasonably know,* intend to use the object to facilitate a violation of this act...." 35 P.S. § 780–102 (emphasis added).

Although the statutory language does indicate that these factors should be weighed by a court, the language also indicates that the factors should be considered by "other authorit[ies]." 35 P.S. § 780–102 ("In determining whether an object is

---

3. *See Holt,* 952 A.2d at 1204 n. 12, for the extensive list of items identified as "drug par-      aphernalia."

drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors...."). The phrase "other authority" is not defined by the Act. I believe a reasonable inference from this language is that the phrase would include municipal authorities, that is local legislative bodies, such as the City Council of Philadelphia. First, the qualifier "any" as to authority seems purposely broad so as to be inclusive of the variety of governmental bodies that could, in one way or another, deal with issues addressed by the Act. Second, as discussed earlier, Section 41.1 of the Act authorizes *local ordinances* that relate "to the possession, sale or use of drug paraphernalia."[4] Local ordinances are necessarily enacted by "municipal authorities," which are defined as "[t]he body or board authorized by law to enact ordinances or adopt resolutions for the particular municipality." Municipality Authorities Act,[5] 53 Pa.C.S. § 5602. From this it can be reasonably inferred that "other authority" was meant to include local legislative bodies. Thus, the Act directs both courts and local legislative bodies to utilize these factors when regulating drug paraphernalia. While a court's vision in deciding a case is limited to the facts of the particular case before it, a legislative body's focus in enacting legislation necessarily takes on a broader perspective, requiring the legislative body to evaluate the totality of the circumstances within the community as a whole.

In the present case, the City, an "authority," evaluated the totality of the circumstances within its community. Philadelphia's City Council's Committee on Licenses and Inspections conducted a hearing (City Hr'g Tr.) regarding the Ordinance prior to its passage. At this hearing, extensive testimony was presented that described the manner in which these items were being used for illicit purposes, the extent of this illicit use, and the common knowledge within the community of how these items were being used. The testimony also addressed the manner in which various corner stores were distributing these items. The testimony indicated that the items in these stores were directed toward and, in fact, were used in conjunction with marijuana by youth, beginning with preteen children. The whole of the testimony clearly identified a problem within the City that was directly linked with these particular items from the particular locations targeted by the Ordinance.[6]

---

4. Arguably, Section 41.1 not only allows municipalities to do so, but tacitly encourages them to do so.

5. 53 Pa.C.S. §§ 5601–23.

6. Examples of the testimony presented follow.
   A thirty-six year veteran detective, assigned to the Philadelphia District Attorney's office, who also serves as the Director of an anti-drug group, "Not in My Neighborhood" offered the following testimony:
   The purpose of our group is to fight against illegal sale and use of drugs and drug paraphernalia in our City. The way we are doing this is, we have a narcotics tip sheet that we get out to the community where people fill out where there's drug corners, drug houses and anywhere there's illegal drugs going on....

   The other way we're fighting against drug paraphernalia is, we're going after stores that are selling it in our neighborhoods, near our schools and around our kids....
   [Detective lists multiple examples of convenience stores that sell over twenty types of blunts].
   ... These blunts are used by kids to smoke marijuana.
   Blunts come in many popular flavors. They've been made available in more than 30 different ones, including banana, chocolate, crème de mint, watermelon, blueberry, sour apple, vanilla and so on. After these flavored blunts are purchased, they're cut open, the tobacco is removed and replaced with marijuana and smoked. Sometimes the blunts are laced with additives such as cocaine, LSD and PCP. A marijuana-filled

The prohibition of subsections (.1) and

blunt is as strong as four joints. Flavored blunts are mainly used by teenagers to smoke marijuana.

There's also a hollow blunt, and that is just a wrap with no tobacco in it, and that's sold for no other reason than to smoke marijuana. On the wrapper, it says, "Number one blunt in the world."

We also found that flavored blunts are being sold in stores like [various drug store chains], gas stations, Chinese food stores, delis, beer distributors, malls, barbers shops, hairdressers and cigar shops.

(City Hr'g Tr. at 21–24.)

The medical director for Gaudenzia, Incorporated, a drug and alcohol treatment organization, testified from his experience dealing with children who have presented for drug addiction treatment, that marijuana was the "main gateway drug that is an entryway into a life of drug addiction" and that the marijuana use starts "around 7 or 8 years old smoking blunts, using drugs." (City Hr'g Tr. at 33.) He noted that these items were "available so readily on our neighborhood corners to minors, adolescents. People have no idea what they're getting into." (City H'rg Tr. at 33.) He also testified that "I think it really sends a wrong message when you can get a blunt, a pack of cigarette papers along with your Now and Laters and Lemonheads and pretzel sticks." (City H'rg Tr. at 40.)

Additionally, an Associate Professor of Medicine at the University of Pennsylvania School of Medicine testified as to "the ravages, the ravages in [his] patient population" caused by long-term drug use that starts with "young people" using marijuana. He discussed the subsequent "incidence of depression, suicide and a lot of other medical problems that we all end up paying for." (City Hr'g Tr. at 35.)

A local attorney testified that "[e]fforts to stop the grip of violent drug trade are dealt a serious blow when the use of drugs, especially the gateway drug of marijuana, are given tacit approval. Any drug dealer ... [need] only walk down [to] the store to get the tools necessary [for their trade because] these stores do not prohibit the sales of crack pipes, blunts and cigarette papers that are ostensibly used for tobacco[, but are instead] used to facilitate the drug trade." (City H'rg Tr. at 47.) He also testified that "a clear message" is being sent to kids "that drugs are permissible and sanctioned" because the "tools of the drug trade are sold in the same places where mom buys milk, eggs and gets gas...." (City Hr'g Tr. at 49.) He also testified that people who do actually smoke blunts with tobacco and who do roll their own cigarettes can still acquire these materials through a tobacco specialty store. (City Hr'g Tr. at 50.)

A former Assistant District Attorney from the Philadelphia District Attorney's Public Nuisance Task Force testified about various sting operations in Philadelphia clubs, in which mounds of tobacco were found on the floor, having been hollowed out from blunts, to enable marijuana to be placed inside. He also testified that undercover agents on the scene saw people carving out the tobacco from the blunts and filling the carved-out blunts with marijuana.

The founder and executive director of Mothers in Charge, a local citizen action group composed of "mothers, grandmothers, aunts and sisters, many of whom have lost our sons and daughters to violence [that often] goes hand in hand with ... drug use," testified as to her concerns that blunts, with their varying aromas and colors, were being marketed to children. (City H'rg Tr. at 62–63.) She noted that "kids begin smoking young because they think it's cool with the different flavors and aromas and colors. And before that, before long, it leads to other types of illegal drug use." (City Hr'g Tr. at 63.)

Additionally, a drug and alcohol counselor from Presbyterian Medical Center testified that many of the items that had been discussed at the hearing were listed "by name" on "a marijuana website" as being "good ... to smoke marijuana through...." (City Hr'g Tr. at 67.) Thus, he testified that the use of these items as drug paraphernalia is well known and would be known to the businesses that sell them. He also testified that, from his own experience, "[i]t's very typical for me on my way to work to stop into [a convenience store] and [see] the person in front of me purchase a single blunt and not go around the corner, but directly go outside the store, empty that blunt onto the ground, fill it with marijuana and stand at the bus stop and smoke these products." (City Hr'g Tr. at 67.)

The executive director of a citizens action group, Men United for a Better Philadelphia, testified that "[o]ne of the top calls that we get as an organization is from the residents of Philadelphia asking us to come out to the communities where there are these stop and go's and stores on the corner of their blocks that provide these kind of items to the youth in their communities...." (City Hr'g Tr. at 82.)

(.4) of Section 9–622(5)(a) of the Code are clear, and explicitly identify particular items that may not be sold by retailers. This stands in contrast to the Act's articulation of what constitutes "drug paraphernalia" which, as previously discussed, provided only examples of items that *sometimes* are drug paraphernalia and, thus, are only sometimes illegal. In such an instance a scienter element is essential; the determination of whether an item is drug paraphernalia takes place after the sale, at the time of trial. In contrast, subsections (.1) and (.4) obviate the need for a scienter requirement by specifically identifying, upfront, prior to any sale, what items may not be sold.[7]

Thus, while the Ordinance does not contain a scienter requirement on its face, the clear delineation of what, for purposes of the Ordinance, constitutes "drug paraphernalia" obviates the need for such a requirement. As the Act affords authorities, such as the City, the opportunity to consider these factors and to legislate in furtherance of the Act's goals, I find the City's actions, and the Ordinance itself, to be consistent with the Act.

Additionally, to the extent there was any ambiguity as to whether the Ordinance conflicted with the Act, I believe the deferential standard set forth by the Pennsylvania Supreme Court, in *Nutter v. Dougherty*, 595 Pa. 340, 938 A.2d 401 (2007), requires this Court to, in the facts and circumstances of this case, defer to the City's exercise of municipal powers.

Our Supreme Court, in *Nutter*, recognized that the local actions of a home rule community are still subject to traditional preemption notions. However, the Court was very clear in discussing these preemption principles and their relationship to local action by stating that *"[w]e cannot stress enough* that a home rule municipality's exercise of its local authority is not lightly intruded upon, with ambiguities regarding such authority resolved in favor of the municipality." *Id.* at 361–62, 938 A.2d at 414 (emphasis added).

In *Nutter*, the Pennsylvania Supreme Court affirmed our Court's conclusion that a Philadelphia ordinance that limited campaign contributions to candidates for municipal office was not in conflict with state law, specifically the Election Code,[8] and Pennsylvania constitutional language stating that "[a]ll laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State...." Pa. Const. Art. VII, § 6. In reaching this conclusion, the Supreme Court went into a lengthy discussion relying heavily on *Department of Licenses and Inspections, Board of License and Inspection Review v. Weber*, 394 Pa. 466, 147 A.2d 326 (1959), a case that, in the present appeal, the City also relies on:

> *Weber* presented the question whether the state Beauty Culture Act precluded Philadelphia from passing additional licensure requirements for beauticians in its municipal Health Code. There as here, the act in question itself was silent as to local supplementation, and that omission, appellee argued, was tantamount to an affirmation of the General Assembly's preemptive intent. We rejected this argument, relying in part on

---

7. It is not this Court's function to determine if, *in fact,* there is such a problem in the City. It is also not our function to evaluate the merits and efficacy of the means chosen by the City to address what the City has identified as a problem. Our review is limited to determining if there was a basis for the City's identification of the problem, and if the means chosen to address the problem reasonably relate to it.

8. Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. 2600–3591

the Commonwealth's parallel Barber Act. The two acts, we noted, had initially been passed in tandem in 1931, at which time neither statute addressed local supplementation. Soon after the Barber Act's passage, however, a trial court deemed it to have preemptive effect over local regulation in that field. The General Assembly, in 1935, responded by revising the Barber Act to specifically provide that "[n]othing contained in this act, or the act to which this [is] an amendment, shall be construed as prohibiting any municipality from adopting appropriate ordinances, not inconsistent with ... this act...." 147 A.2d at 328. We found this language probative of the legislature's original intent, in passing the parallel 1931 acts, to leave the fields of barbering and cosmetology open to local supplementation.

While this ruling to some extent sounded in the peculiar legislative histories of the two parallel acts, this Court nonetheless spoke to the broader issues of preemption implicated in the case. Specifically, the Court noted that:

> The Legislature could not be expected to itemize the last towel and drop of antiseptic which, for sanitation and cleanliness, would be required in every barber and beauty shop in the State. The size of the municipality, congestion of population, geography of locale, weather and climate prevailing in the area could have a very decided bearing on the extent of the meticulousness of the sanitary supervision required in any particular group of shops. It would not be unnatural to assume that regulations could be stricter and more rigid in large cities where the turnover in clientele would be comparatively rapid as against a village or small rural center where the customers are known by their first name, occupation and frequency of visit.

*Id.* at 329. Furthermore, we quoted our *Western Pennsylvania Restaurant Association*[9] decision to the effect that "[a] municipal corporation ... may make such additional regulations in aid and furtherance of the purposes of the general law." *Id.* at 330 (quoting *W. Penna. Rest. Ass'n.*, 77 A.2d at 620). *Nutter*, 595 Pa. at 364, 938 A.2d at 415 (footnote and second bracketed alteration added).

The City's argument in this case is quite consistent with the confines established by the Supreme Court in *Weber*, as discussed in *Nutter*. The City argues that:

> [H]ere, a large urban area like Philadelphia has a greater need than most other municipalities in the Commonwealth for stricter, more rigid regulation of items commonly used for illegal drug use. Philadelphia has an unfortunate proximity to illegal drugs. Its international airport, major shopping terminals and proximity to major interstates and rail systems facilitate drug trafficking, and major New York drug trafficking organizations use Philadelphia as a shipment point for illegal drugs.... Further, as the hearing testimony established, the specific problem targeted in this case is inexpensive cigars sold by convenience and drug stores that are not commonly known as purveyors of primarily drug paraphernalia.... Clearly such a problem is exacerbated in a large urban area like Philadelphia, where Wawa stores and Sunoco mini-mart type shops proliferate, as compared to the bucolic pas-

**9.** *Western Pennsylvania Restaurant Association v. Pittsburgh,* 366 Pa. 374, 77 A.2d 616 (1951).

tures of Adams County, for example. It therefore furthers the purpose of the ... Act, not frustrates it, when the City enacts legislation in the field of Drug Paraphernalia that targets a specific problem within that field, blunt cigars, and deals with it more specifically and strictly than does the Act itself.

(City's Br. at 18–19.) Given *Nutter* and its explicit direction, I would find this argument adequately supports the City's exercise of its home rule municipality powers.

Accordingly, because I believe that the City appropriately and consistently legislated in furtherance of the Act's provisions, I would reverse the trial court's order as to Section 9–622(5)(a)(.1) and (.4). Additionally, even if there is ambiguity on the point of whether or not the Ordinance is preempted, per *Nutter*, I would find in favor of the City. For these reasons I must concur in part, and dissent in part from the majority's thoughtful opinion.

Judge SMITH–RIBNER joins in this concurring and dissenting opinion.