10 A.3d 902

HOLT'S CIGAR COMPANY, INC., Black Cat Cigar Company, Altadis USA, Inc., Swisher International, Inc., John Middleton, Inc., Cigar Association of America, Inc., and Pennsylvania Distributors Association, Inc., Appellees and Cross–Appellants

v.

The CITY OF PHILADELPHIA and Robert D. Solvibile, in his Official Capacity as Acting Commissioner of the Department of Licenses and Inspections of the City of Philadelphia, Appellants and Cross–Appellees.

Supreme Court of Pennsylvania.

Argued March 9, 2010.

Decided Jan. 19, 2011.

John S. Summers, John Stephen Stapleton, Mark Alan Aronchick, Matthew Aaron Hamermesh, Hangley Aronchick Segal & Pudlin, P.C., for Holt's Cigar Co., Black Cat Cigar Co., Altadis USA, Inc., Swisher Intern., Inc., John Middleton Inc., Cigar Assn. of America Inc. and Pennsylvania Distributors Assn., Inc.

150

Jane Lovitch Istvan, City of Philadelphia Law Dept., Richard Feder, for City of Philadelphia and Robert D. Solvibile.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

The issue presented in this case is whether a municipal ordinance regulating the sale of certain tobacco items and other potential drug paraphernalia is preempted by state law. We conclude that the ordinance is inconsistent with the Controlled Substance, Drug, Device and Cosmetic Act, and, accordingly, is preempted.

On January 23, 2007, the Philadelphia City Council enacted an ordinance to

[a]mend[ ] Chapter 9–600 of The Philadelphia Code, entitled "Service Businesses," to add new provisions to prohibit the sale, from certain retail establishments, of "blunts," "loosies," cigarette papers, cigars and other items that may be otherwise legal but that are commonly used as drug paraphernalia, under certain terms and conditions.

City of Philadelphia Bill No. 060345–AAA, as amended on 11/30/06, at 1.

The ordinance was designed "to correct and control a[ ] growing trend among Philadelphia youth and others to purchase cigars, empty the tobacco from those cigars, and substitute marijuana and/or stronger illegal drugs into the cigar wrapping." Memorandum of Law of the City of Philadelphia and Robert Solvibile in Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated 2/21/07, at 2 (hereinafter "2/21/07 City Memorandum of Law"). To this end, the ordinance banned the sale of flavored cigars and other tobacco products that are preferred by illicit drug users as vehicles for smoking marijuana and other illegal drugs, and also banned the sale of cigars and other tobacco products in quantities of less than three. No *mens rea* provision was included in the

above ordinance; hence, the mere sale of the listed items constituted a violation, without regard to the seller's intent or knowledge. In addition, the ordinance prohibited the sale of single or flavored tobacco products or of drug paraphernalia within 500 feet of a school, recreation center, day care center, church, or community center, "regardless of the intent as to use of the item." Philadelphia Code §§ 9–622(5)(a) and 9–629(2); *see also* 2/21/07 City Memorandum of Law at 2–3. Violators of the ordinance were subject to a fine of up to $2,000, and to revocation of their business privilege license. Philadelphia Code §§ 9–622(6)(f) and 9–629(4).

On January 30, 2007, Holt's Cigar Company and other tobacco retailers, manufacturers, and trade associations (hereinafter collectively "Holt's Cigar") challenged the ordinance by filing a complaint against the City of Philadelphia and Robert D. Solvibile, in his official capacity as acting commissioner of the Department of Licenses and Inspections (hereinafter the "City"). Holt's Cigar sought, *inter alia,* a preliminary injunction against enforcement of the ordinance and a declaratory judgment that the ordinance was preempted by the drug paraphernalia provisions of the Controlled Substance, Drug, Device and Cosmetic Act (hereinafter the "Act")[1] which bars the delivery of drug paraphernalia under circumstances where the offender knew or reasonably should have known that the paraphernalia would be used to introduce a controlled substance into the human body in violation of the Act. *See* 35 P.S. § 780–113(a)(33). The trial court issued a consent order granting a preliminary injunction against enforcement of the ordinance, and the parties agreed to submit the case on the pleadings and certain stipulated facts and documents. On March 9, 2007, the court issued its final disposition, holding that the ordinance was preempted by the Act. *See* Trial Court Order, dated 3/9/07. More specifically, the trial court concluded that the ordinance was inconsistent with the Act

1. Act of 1972, April 14, P.L. 233, *as amended,* 35 P.S. §§ 780–101–780–144. The provisions as to drug paraphernalia were added by the Act of 1980, December 4, P.L. 634, 35 P.S. §§ 780–102, 780–113, 780–141.1.

because the ordinance "converts a specific intent offense into a strict liability one." Trial Court Opinion, dated 3/9/07, at 9.

The City filed a timely appeal to the Commonwealth Court. On June 23, 2008, a divided Commonwealth Court issued its ruling in a published opinion, affirming in part and reversing in part. *Holt's Cigar Company, Inc. v. City of Philadelphia,* 952 A.2d 1199 (Pa.Cmwlth.2008) (*en banc*).[2] The Commonwealth Court affirmed the trial court's order insofar as it deemed preempted the ordinance provisions banning the sale of single or flavored cigars or other tobacco product. *Id.* at 1205–06. However, the Commonwealth Court further concluded that the ordinance's provision banning the sale of certain tobacco products or other potential drug paraphernalia within 500 feet of a school or other community building was a zoning regulation, and hence was not preempted pursuant to the preemption clause of the Act. *Id.* at 1207–08; *see* text, *infra.*

 Both parties petitioned this Court for allowance of appeal, and the petitions were granted and consolidated, with the City designated as Appellants and Cross–Appellees, and Holt's Cigar designated as Cross–Appellants and Appellees. The sole issue was rephrased by this Court for clarity as follows:

> Does the General Assembly's inclusion of a *scienter* requirement in the crimes established by 35 P.S. § 780–113(a)(33) preempt Philadelphia Code §§ 9–622(5)(a) and 9–629(2), which impose civil penalties for the sale of enumerated products without requiring a showing of seller's intent?

*Holt's Cigar Company, Inc. v. City of Philadelphia,* 601 Pa. 572, 975 A.2d 1081 (2009).

**2.** The composition of the majority varied depending upon the particular section of the ordinance at issue. The majority opinion was authored by Judge Leavitt. Judge Friedman authored a concurring and dissenting opinion. *See* text, *infra.* Judge Cohn Jubelirer also authored a concurring and dissenting opinion, joined by Judge Smith–Ribner, expressing the view that the entire ordinance was valid. Judge McGinley dissented without further statement.

■ This case presents a pure question of law, for which our standard of review is *de novo* and our scope is plenary. *See Nutter v. Dougherty*, 595 Pa. 340, 938 A.2d 401, 412 n. 20 (2007). We must first consider the source of authority under which Philadelphia may exercise self-governance.

■ Municipalities "possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect." *Huntley & Huntley, Inc. v. Borough Council of the Borough of Oakmont*, 600 Pa. 207, 964 A.2d 855, 862 (2009) (quoting *City of Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75, 84 (2004)). As a city of the first class pursuant to the First Class City Home Rule Act,[3] Philadelphia "may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions." 53 P.S. § 13131. Under the concept of home rule, the ability of a locality to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and enactments of the General Assembly. *Schweiker, supra* at 84; 53 Pa.C.S. § 2961. In addition, grants of municipal power to a home rule municipality are to be "liberally construed in favor of the municipality." 53 Pa.C.S. § 2961. Thus, in analyzing a home rule municipality's exercise of power, we resolve ambiguities in favor of the municipality. *Nutter, supra* at 411.

■■ Notwithstanding the principle that a home rule municipality's exercise of local authority is not lightly intruded upon, we have recently explained that there are three closely related forms of state preemption of local lawmaking authority. *Nutter, supra* at 404. In express preemption, "a statute specifically declares it has planted the flag of preemption in a field." *Id.* (citing *Department of Licenses and Inspections, Board of License and Inspection Review v. Weber*, 394 Pa. 466, 147 A.2d 326, 327 (1959)). In field preemption, a "statute is silent on supersession, but proclaims a course of regulation

---

3. Act of 1949, April 21, P.L. 665, *as amended,* 53 P.S. §§ 13101–13116, 13131, 13133, 13155–13157.

and control which brooks no municipal intervention." *Id.* (citing *Weber, supra* ).

Finally, pursuant to the doctrine of conflict preemption, which is the only form of preemption at issue in the instant case, a local ordinance that contradicts, contravenes, or is inconsistent with a state statute is invalid. *Id.; Mars Emergency Medical Services, Inc. v. Township of Adams,* 559 Pa. 309, 740 A.2d 193, 195 (1999) (citing *Western Pennsylvania Restaurant Association v. City of Pittsburgh,* 366 Pa. 374, 77 A.2d 616, 620 (1951)). For conflict preemption to be applicable, the conflict between the statute and the ordinance must be irreconcilable. *City Council of the City of Bethlehem v. Marcincin,* 512 Pa. 1, 515 A.2d 1320, 1326 (1986). Further, the ordinance in question must be considered in light of the objectives of the General Assembly and the purposes of the relevant statute. A local ordinance may not stand as an obstacle to the execution of the full purposes and objectives of the Legislature. *Huntley, supra* at 863. But "it has long been the established general rule, in determining whether a conflict exists between a general and local law, that where the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable." *Mars Emergency, supra* at 195 (citation omitted).

A relevant example of this Court's invalidation of a local ordinance based on conflict preemption is *Mazzo v. Board of Pensions and Retirement of the City of Philadelphia,* 531 Pa. 78, 611 A.2d 193 (1992). The issue in *Mazzo* concerned the denial of pension benefits to public employees who had been charged with criminal misconduct related to public employment. Pursuant to the Public Employee Pension Forfeiture Act (PEPFA),[4] public employees who have been charged with criminal conduct, but found not guilty, **shall** receive all their

4. Act of 1978, July 8, P.L. 752, *as amended,* 43 P.S. § 1311–1315.

pension benefits. *Id.* at 195 (citing 43 P.S. § 1313(b)). However, pursuant to the challenged City of Philadelphia ordinance, public employees who had been charged with criminal conduct were ineligible to receive their pension benefits unless they had been **both** restored to their position of employment **and** found not guilty of the charges. This Court held that there was "an obvious conflict" between the PEPFA and the city ordinance at issue. *Id.* at 195. We concluded that there was no indication in the PEPFA's language that political subdivisions were free to impose further conditions upon the restoration of benefits than were mandated by the statute. *Id.* at 195–96. We recognized that, in enacting the PEPFA, the General Assembly sought to promote integrity in public employment by deterring criminal conduct. In addition, we recognized a second, implied objective of the General Assembly in enacting PEPFA, *i.e.*, to ensure that individuals who have accumulated pension savings are not unjustly deprived of this important property interest. In sum, in *Mazzo*, we held the city ordinance invalid because it was in "plain conflict with PEPFA's directive that benefits be paid if the accused employee is not found guilty" of the charged criminal misconduct. *Id.* at 197. *Mazzo* is an example of a case in which the conflict between the state and local enactments was irreconcilable because the ordinance added an additional requirement, which was implicitly barred by the statute and which stood as an obstacle to one of the implied objectives of the legislature.

In other relevant precedents, this Court has held that a local ordinance was not preempted. In *Marcincin, supra,* the city ordinance at issue limited an incumbent mayor to two terms in office. Although the city had the authority to fix the term and tenure of city officials under the Third Class City Charter Law,[5] the ordinance was challenged as in conflict with a section of the state Election Code providing that elected officers, including the mayor, "shall be eligible to reelection." *Marcincin, supra* at 1321–23 and n. 1 (quoting 53 P.S. § 35701). Based on the text of the statute, we determined that the term "reelection" did not "connote[ ] an infinite

5. Act of July 15, 1957, P.L. 901, § 101, 53 P.S. § 41101 *et seq.*

number of successive opportunities of election to the same municipal office." *Id.* at 1323. Therefore, because the statute neither addressed the matter of term limits, nor barred the city from doing so, we concluded that the statute and the city ordinance did not irreconcilably conflict. *Id.* at 1321, 1326.

In two other cases, this Court upheld the validity of local ordinances imposing additional business regulations that were in excess of or in addition to the standards required by state law. In *Department of Licenses and Inspections v. Weber*, 394 Pa. 466, 147 A.2d 326, 327 (1959), the ordinance at issue was a section of the Philadelphia City Health Code that required beauty shops to have a city license and to meet safety and sanitation standards set by the city. A beauty shop owner challenged the ordinance, claiming that it was preempted by the Beauty Culture Act,[6] which required state licensing of beauty shops and also set forth regulations relevant to safety of the patrons and cleanliness of the facility. This Court concluded that the ordinance was not preempted because it facilitated the purpose of the Beauty Culture Act by serving cleanliness, enhancing sanitation, and preserving health. *Weber, supra* at 330. Furthermore, rather than conflicting with the Beauty Culture Act, the ordinance supplemented the safety and health standards set forth in the statute, as illustrated in the following examples:

The State requires that floors be kept "in a clean and sanitary condition" [ ]; the City says they shall be free of cracks and holes and so constructed as to admit of rapid cleansing. The State grounds an operator who is knowingly suffering from a contagious or infectious disease; the City ... requires operators to submit to annual chest x-ray examinations, also to abstain from narcotics, and not to be under the influence of alcohol while administering treatments. The State says that tools shall be cleaned and sterilized, the City specifies the degree of heat and the content of chemical preparations to be used in the sterilizing process; etc., etc. Moreover, the City has added requirements not included in the State statute. Thus, beauty shops

6. Act of May 3, 1933, P.L. 242, 63 P.S. § 507 et seq.

must have certain lighting; they must be unhospitable to insects and rodents by the erection of barriers to their visits; operators must not smoke while serving patrons; equipment must be fireproof and asphyxiation-proof. . . .

*Weber, supra* at 330.

Thus, because the regulations set forth in the ordinance promoted the protective purpose of and were not inconsistent with the Beauty Culture Act, we held that the ordinance was not preempted.

*Weber's* holding relied on an earlier, similar case in which the ordinance in question was enacted by the city of Pittsburgh to regulate the operation of restaurants. *Western Pennsylvania Restaurant Association v. City of Pittsburgh,* 366 Pa. 374, 77 A.2d 616 (1951). The title of the ordinance made clear that it was designed to "carry into effect in the City of Pittsburgh the provisions of the Act of Assembly of 1945, P.L. 926, to safeguard the public health within the [C]ity of Pittsburgh." *Restaurant Association, supra* at 618 (quoting a portion of the title of the ordinance). The Restaurant Association challenged the ordinance, claiming, *inter alia,* that it was inconsistent with, and thus was preempted by the Act of 1945, P.L. 926, which had the same purpose and covered the same area as the ordinance. *Restaurant Association, supra* at 618.

In *Restaurant Association,* we reiterated the general principle that local municipalities "may regulate certain occupations by imposing restrictions which are in addition to, and not in conflict with, statutory regulations." *Id.* at 620. We also noted that "sanitary standards and appropriate regulations in the case of restaurants in a large city . . . no doubt are [ ] quite different from those applicable to rural communities, in view, among other conditions, of the unusually larger number of patrons and the congestion of buildings with consequent special problems of their construction and ventilation." *Id.* We held that the ordinance was not preempted, except for some provisions that were contradictory to specific provisions of the statute. For example, we concluded that the statute

preempted the following provisions of the ordinance: penal provisions that were more drastic than those in the statute, and provisions that required fines to be paid to the city instead of, as in the statute, to the county. Thus, in *Restaurant Association*, we upheld the challenged ordinance, except with respect to those provisions that clearly and directly were inconsistent with and contradictory to the statute.

In the instant case, the challenged city ordinance provides as follows:

§ 9–622. Cigarettes and Tobacco Products.

\* \* \*

(5) Retail Businesses

(a) It shall be unlawful for any retail business to sell or furnish by gift, purchase or other means any of the following:

(.1) any **cigarette, cigar, tiparillo, cigarillo** or other tobacco product, **singly or in packages of fewer than three** or other than in the package, box, carton or other container provided by the manufacturer, importer or packager which bears a health warning required by federal law, except that hotels, restaurants that seat at least 25 patrons, and specialty tobacco stores (as defined in Section 9–622(4)) may sell in small quantities cigars for which the retail price is at least one dollar ($1) per cigar;

(.2) cigar or cigarette rolling papers;

(.3) any tobacco item that can be considered "drug paraphernalia" under Section 9–629;

(.4) any flavored tobacco item including any **flavored cigarette, cigar, tiparillo, cigarillo** or other tobacco product, except that the term "tobacco product" shall not include a package of loose tobacco, snuff, chewing tobacco, dipping tobacco, or pipe tobacco, where the package is that provided by the manufacturer, importer or packager which bears a health warning required by federal law, and provided that this subsection (.4) shall not apply to cigarettes in packages of 20 or more included in the directory published pursuant

to Section 301 of the Pennsylvania Tobacco Product Manufacturer Directory Act, 35 P.S. Section 5702.301.

(6) Enforcement and Penalties

\* \* \*

(f) ... any person who violates subsection 9–622(5) shall be subject to the following penalties:

(i) Any person who violates the provisions of subsection 9–622(5) shall be subjected to a fine of not less than three hundred dollars ($300) and not more than seven hundred dollars ($700) for each violation committed during calendar year 2005; ... nineteen hundred dollars ($1,900) for each violation committed during calendar year 2008; and two thousand dollars ($2,000) for each violation committed thereafter.

(ii) In addition to the penalties outlined above, the Department of Licenses and Inspections may revoke the business privilege license of any person violating the provisions of subsection 9–622(5).

§ 9–629. Drug Paraphernalia, Blunt Cigars, and Similar Items.

(1) It shall be unlawful for any person, including any retail business, to sell or offer for sale any of the following:

(a) Any item that constitutes drug paraphernalia, as that term is defined in the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780–102, where the seller knows, or under the circumstances reasonably should know, that it would be used to convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of that Act, especially any of the following:

(.1) Containers, bags, capsules, balloons, envelopes and other containers used, intended for use or designed for use in packaging small quantities of controlled substances, as well as cigars, cigarettes and related items intended for use in concealing or holding such substances;

(.2) Objects used, intended for use or designed for use in ingesting, inhaling or otherwise introducing marihuana, cocaine, hashish or hashish oil into the human body, such as:

(.a) Cigars sold singly, flavored cigars known as "blunts," unflavored "blunts," flavored and unflavored blunt wraps, cigarette rolling papers, cigarillos, and tiparillos;

(.b) Metal, wooden, acrylic, glass, stone, plastic or ceramic pipes with or without screens, permanent screens, hashish heads or punctured metal bowls;

(.c) Water pipes;

(.d) Carburetion tubes and devices;

(.f) Smoking and carburetion masks;

(.g) Roach clips; meaning objects used to hold burning material such as a marihuana cigarette that has become too small or too short to be held in the hand;

(.h) Chamber pipes;

(.i) Carburetor pipes;

(.j) Electric pipes;

(.k) Air-driven pipes;

(.l) Chillums;

(.m) Bongs;

(.n) Ice pipes or chillers;

(.o) Miniature cocaine spoons and cocaine vials;

(.p) Rose and pen combinations.

(2) It shall be unlawful for any person, including any retail business, to sell or offer for sale within five hundred (500) feet of a school, recreation center, day care center, church, or community center any of the items identified in either Section 9–622(5) or Section 9–629(1), **regardless of the intent** as to use of the item.

\* \* \*

(4) Penalties

\* \* \*

(a) In addition to the penalties as presently provided by law, any person in violation of this Section shall be subject

to a civil penalty of seven hundred dollars ($700) for each violation committed during calendar year 2005; ... nineteen hundred dollars ($1,900) for each violation committed during calendar year 2008; and two thousand dollars ($2,000) for each violation committed thereafter.

(b) In addition to the penalties outlined above, the Department of Licenses and Inspections may revoke the business privilege license of any person violating the provisions of this Section.

Philadelphia Code §§ 9–622 and 9–629 (emphasis added).

As previously noted, Sections 9–622(5)(a) and 9–629(2) include no *mens rea* element. Rather, the sale of certain tobacco products (§ 9–622(5)(a)), or the sale of a whole list of potential drug paraphernalia within 500 feet of a school or a variety of other community buildings (§ 9–629(2)), constitutes a violation of the ordinance regardless of the seller's intent or knowledge.[7]

The delivery, which includes the sale, of drug paraphernalia has also been prohibited by the General Assembly through enactment of the Controlled Substance, Drug, Device and Cosmetic Act. However, in contrast to the ordinance challenged in this appeal, the Act expressly and unmistakably sets forth a *mens rea* element, as follows:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

*　　*　　*

(33) The delivery of, possession with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, **knowing, or under circumstances where one reasonably should know,** that it would be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce

---

7. Section 9–629(1), which includes a *scienter* requirement, was upheld by the Commonwealth Court and is not at issue in this appeal.

into the human body a controlled substance in violation of this act.

35 P.S. § 780-113(a)(33) (emphasis added).

The statutory definition of "drug paraphernalia" is as follows:

**"Drug Paraphernalia"** means *all* **equipment, products and materials of any kind** which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act. It includes, but is not limited to: [here follows a long list of potential drug paraphernalia, including scales, several chemicals, kitchen-type equipment as well as more specialized equipment, all sorts of containers, syringes and needles, various pipes].

**In determining whether an object is drug paraphernalia,** a court or other authority should consider, in addition to all other logically **relevant factors,** [1] **statements by an owner** or by anyone in control of the object concerning its use, [2] prior convictions, if any, of an owner or of anyone in control of the object ..., [3] the **proximity** of the object, in time and space, to a direct violation of this act, [4] the **proximity** of the object to controlled substances, [5] the existence of any residue of controlled substances on the object, [6] direct or circumstantial **evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons who he knows, or should reasonably know, intend to use the object to facilitate a violation of this act,** [7] the innocence of an owner or of anyone in control of the object, as to a direct violation of this act should not prevent a finding that the object is intended for use or designed for use as drug paraphernalia, [8] **instructions,** oral or written, provided with the object concerning its use, [9] descriptive materials accompanying the object which explain or depict its use, [10] national and local advertising

concerning its use, [11] the **manner in which the object is displayed for sale,** [12] **whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products,** [13] direct or circumstantial evidence of the **ratio of sales** of the objects to the total sales of the business enterprise, [14] the existence and scope of **legitimate uses** for the object in the community, and [15] **expert testimony** concerning its use.

35 P.S. § 780–102 (emphases in second paragraph added).

 Thus, whether an item is drug paraphernalia for purposes of the Act is a determination for the court, which should consider all relevant factors, including legitimate uses for the item; the intent of and statements by the item's owner; how the item is displayed for sale; and whether the owner is a legitimate supplier, such as a licensed distributor or dealer of tobacco products.[8] The Act recognizes that some drug paraphernalia have legitimate as well as illegitimate uses, and, in contrast to the ordinance, one of the Act's implicit objectives is to *not* penalize those who sell dual-use items for legitimate uses.

Finally, by the inclusion of an explicit savings clause, the Act makes clear that it does not preempt all local enactments; it preempts only those that are inconsistent:

Nothing in this act relating to drug paraphernalia shall be deemed to supersede or invalidate any **consistent** local ordinance, including zoning and nuisance ordinances, relating to the possession, sale or use of drug paraphernalia.

35 P.S. § 780–141.1 (emphasis added).

Thus, the General Assembly's intent was not to occupy the entire field with the Act; rather, it was to allow **consistent**

8. We emphasize that the statutory definition of "drug paraphernalia" is very broad, meaning, in relevant part, "**all** equipment, products and materials of any kind which are used [or] intended for use in … injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act." 35 P.S. § 780–102 (emphasis added). The definition of "drug paraphernalia" also includes a lengthy list of items, but it expressly states that "**drug paraphernalia" is not limited to the items on the list.**

local ordinances relating to the possession, sale, or use of drug paraphernalia. The question before us is whether the challenged ordinance is consistent or irreconcilably conflicts with the Act. A seller of a dual-use item violates the Act **only** if he or she knows or reasonably should know that the dual-use item is to be used for an illegal, drug-related purpose. In contrast, a seller of certain dual-use items violates the ordinance by merely engaging in the sale, with no consideration as to whether the item was sold for a legitimate use or for an illegal, drug-related purpose, and no consideration of the seller's state of mind or intent.

The presence of a *mens rea* element in the statute and the absence of a *mens rea* element in the ordinance for the same proscribed conduct, *i.e.*, selling certain dual-use items, constitute an irreconcilable conflict between the two enactments. Although the ordinance does not stand as an obstacle to the primary purpose of the Act, *i.e.*, to decrease the unauthorized use of controlled substances, the ordinance does contradict an implied objective of the Act to protect those who sell dual-use items for legitimate purposes.[9] Similar to the ordinance in *Mazzo, supra,* and to limited portions of the ordinance in *Restaurant Association, supra,* the ordinance here is inconsistent with the state enactment, and the ordinance is thus preempted.

9. We are puzzled by the dissent's assertion that we infer protection under the Act, not just for those who sell dual-use items for legitimate purposes, but also for "those who elect to be deliberately blind to the uses that are made of their wares, as well as those who know perfectly well what the uses are, but who take the risk that the police will not catch them." Dissenting Opinion (Castille, C.J.) at 171, 10 A.3d at 917; *see also id.* at 181–82 n. 8, 10 A.3d at 924 n. 8. Nothing in this majority opinion supports, or should be taken to support, such an assertion. The *scienter* element of the relevant provision of the Act is "**knowing, or** under circumstances where one **reasonably should know.**" 35 P.S. § 780–113(a)(33) (emphasis added). Thus, deliberate blindness to the drug-related uses of one's wares is certainly not protected under the Act, and nothing in the majority opinion remotely suggests that it would be. Likewise, the dissent's assertion that we have inferred protection for those who assume the risk that they will be apprehended by law enforcement for violating the Act finds no basis in the text of this majority opinion.

The City argues that there is no conflict between the Act and the ordinance because the former provides for criminal penalties and the latter is a civil statute. We do not agree. Our focus is directed toward the particular conduct proscribed by the Act and by the ordinance; the nature or severity of the penalties imposed is not determinative and does not eliminate the conflict arising from the discrepancy with respect to *mens rea* for a particular course of proscribed conduct.

The City further suggests that the General Assembly was simply silent as to the possible imposition of *per se* liability for the delivery of dual-use items. The City argues that, pursuant to *Nutter, supra,* such silence should not be interpreted as a legislative intent to prohibit local regulation of the sale of dual-use items in a manner free of a scienter requirement. *See Nutter, supra* at 403, 409–10 & n. 19, 413–14, 416 (declining to conclude that local regulation of campaign contributions to candidates for municipal office was preempted by the Election Code,[10] where the General Assembly was silent as to statewide contribution limits). Again, we cannot agree with the City, and we conclude that *Nutter* is inapposite. With regard to offenses involving delivery of drug paraphernalia, the General Assembly was far from silent as to the *mens rea* element. The Act expressly requires that an offender know or reasonably should know that the drug paraphernalia would be used in conjunction with a controlled substance in violation of the Act; thus, a seller of a dual-use item for legitimate purposes is protected from any penalty under the Act.

Thus, in sum, we affirm the Commonwealth Court's holding insofar as it concluded that Section 9–622(5)(a) was preempted by the Controlled Substances Act; however, we reverse the Commonwealth Court's holding with regard to Section 9–629(2). Our conflict preemption analysis applies equally to Sections 9–622(5)(a) and 9–629(2), and both are preempted under the same rationale.[11]

10. 25 P.S. § 2600 *et seq.*

11. The Commonwealth Court erred by concluding that Section 9–629(2) was a zoning ordinance and thus was saved from preemption by the language of the Act's preemption clause. *See* 35 P.S. § 780–141.1

Based on the foregoing analysis, the Order of the Commonwealth Court is affirmed in part and reversed in part.

Justices EAKIN and BAER join the opinion.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE files a dissenting opinion in which Justices TODD and ORIE MELVIN join.

Justice SAYLOR, concurring.

I join the majority opinion, subject only to the following, modest comments and reservations. Initially, I find Mr. Chief

(providing that nothing in the Act shall invalidate "any consistent local ordinance, including zoning and nuisance ordinances, relating to the possession, sale or use of drug paraphernalia"). The rationale of the Commonwealth Court seems to be as follows: Section 9–629(2) was a zoning ordinance because its main purpose was not to restrict drug use, but rather to create a buffer zone so that individuals attending church and other community events would not have to witness the sale of certain tobacco-related items. *Holt's Cigar*, 952 A.2d at 1207.

Judge Friedman dissented from this portion of the Commonwealth Court's holding, based, *inter alia*, on the following rationale:

[ ] I disagree with the majority that the main purpose of Section 9–629(2) is to shield children and churchgoers from having to observe a blunt sale[,] not to restrict drug use. [ ] Contrary to the majority's assertion, the record evidence allows no room for doubt that the only goal of the ordinance is to combat drug use. In addition, the majority fails to explain how the mere sight of a cigar sale can have a deleterious effect on children and/or churchgoers. Moreover, I cannot comprehend how the sale of a blunt or a single cigar could be more injurious to the health or sensibilities of children and churchgoers than the sale of multiple cigars and other tobacco products, which is not prohibited under section 9–629(2).

*Holt's Cigar*, 952 A.2d at 1211 (Concurring and Dissenting Opinion, Friedman, J.) (quotation marks and footnote omitted; emphasis in original). We agree with Judge Friedman.

The challenged ordinance amended the Service Businesses portion of the Philadelphia Code, and its sole stated purpose was to prohibit the sale by certain retail establishments of specified items that, although legal, are commonly used in the illegal drug trade. *See* City of Philadelphia Bill No. 060345–AAA, as amended on 11/30/06, at 1. The ordinance does not concern land use, the province of zoning, as it does not purport to regulate *where* the retail establishments at issue may be located. Rather, the ordinance purports to regulate what the retailers may sell, *e.g.*, no flavored cigars, or how they may sell their wares, *e.g.*, no single cigars. Contrary to the Commonwealth Court's conclusion, such regulation of the business activities of retail establishments simply does not fit within the concept of zoning, and Section 9–629(2) cannot be classified as a zoning ordinance.

Justice Castille's dissent to be very effective in making the point that there are circumstances in which more restrictive measures by a home-rule local government—on account of pressing local concerns—may be regarded as consistent with broader statutory schemes establishing some minimal standards of conduct. *Cf. Leibowitz v. City of Mineola, Tex.,* 660 F.Supp.2d 775, 788 (E.D.Tex.2009) (finding that a local dog-restraint ordinance more restrictive than standards set by a state statute was not preempted). I depart, however, from the dissent in its assertion that the Legislature has manifested no intention to protect sellers of tobacco products beyond what is required by due process for criminal conviction under the Act. *See* Dissenting Opinion at 184, 10 A.3d at 925–26. In this regard, as the majority stresses, the Legislature took pains to avoid penalizing the sale of dual-use products, absent actual or constructive knowledge of a purchaser's intention for illicit use.

In the present circumstances, I find that the local regulation of cigar sales in Philadelphia simply goes too far in impinging on legitimate enterprises which I believe the General Assembly did seek to protect as an apparent, subsidiary purpose, and therein lies the impermissible conflict.

Finally, I agree with Judge Friedman's position that an inconsistent zoning and/or nuisance regulation is preempted by the Act just as are other types of regulations, *see Holt's Cigar Co. v. City of Phila.,* 952 A.2d 1199, 1212 (Pa.Cmwlth. 2008) (Friedman, J., concurring and dissenting), albeit I do not fully share her views concerning the potential efficacy of local regulation restricting easy access to low-cost dual-use products in school zones, were it allowed, in affording some benefit. *See id.* at 1211, *quoted in* Majority Opinion at 165–66 n. 11, 10 A.3d at 913 n. 11. Moreover, I might be more sympathetic to the City's efforts had there been a greater attempt to balance or accommodate the legitimate interests which I believe were a subject of the General Assembly's concern, for example, by grandfathering existing specialty business premises within the designated zones subject to enhanced regulation. In the absence of any sort of accommodation along these lines, I find

it preferable to leave it to the General Assembly to be explicit should it wish to sanction stricter local regulation of tobacco products with potentially serious economic consequences to established business enterprises operating in Pennsylvania.

Chief Justice CASTILLE, dissenting.

In my view, Sections 622(5)(a)(.1), (.4), and 629(2) of the City's January 2007 ordinance ("Ordinance"), which amended Chapter 9–600 of the Philadelphia Code, are not preempted by the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act ("Act").[1] Therefore, I respectfully dissent.

The state Act is a penal statute that, in relevant part here, imposes criminal penalties on persons who knowingly deliver, possess with intent to deliver, or manufacture with intent to deliver drug paraphernalia, as that term is defined therein. 35 P.S. §§ 780–113(a)(33) (prohibited acts); 780–113(h) (criminal penalties); 780–102 (drug paraphernalia defined).

The City Ordinance prohibits the following: Section 622(5)(a)(.1), the sale by retailers of tobacco products, like cigarettes and cigars, in quantities of three or less ("loosies"); Section 622(5)(a)(.4), the sale by retailers of flavored tobacco products, including cigarettes and cigars, but excluding loose, dipping, or pipe tobacco ("flavored tobacco"); and Section 629(2), the sale by any person of items identified in Section 622(5)(a), including loosies and flavored tobacco, and of items defined as drug paraphernalia by the Act, within five hundred (500) feet of any school, church, recreation center, and similar institutions. Ordinance §§ 622(5)(a); 629(2). All specific items described in the Ordinance possess both legal and drug paraphernalia uses; they are "dual-use items." According to the Ordinance, the described sales of dual-use items are banned, regardless of whether the person or retailer has any knowledge that an item would be used to ingest illegal drugs. Violators of the Ordinance are subject to civil sanctions, which range from fines to revocation of a retailer's City-issued business license. Ordinance §§ 622(6)(f); 629(4).

1. The Act is codified at 35 P.S. §§ 780–101–780–144.

At issue in this case is the conflict preemption claim of several tobacco product retailers ("appellants"), who argue that the local Ordinance supplants and is irreconcilably inconsistent with the statewide Act. Appellants claim that the Act and the Ordinance are in direct conflict because criminal conviction pursuant to the Act requires proof of the seller's knowledge, or *scienter*, that an item will be used to ingest illegal drugs, but sanction pursuant to the Ordinance is based simply on the sale of a dual-use item, without proof of knowledge. Additionally, appellants claim that the Ordinance is in conflict with the Act's supposed purpose of protecting legitimate sellers of dual-use items because the Ordinance bans otherwise legal sales of dual-use items. Appellants submit that the Ordinance "stands to destroy the cigar industry in Philadelphia and cause substantial harms to law-abiding businesses and citizens," in violation of protections afforded to legitimate sellers of dual-use items that they perceive in the statewide Act.

The City responds that the Act expressly addresses and invites consistent local regulation of drug paraphernalia sales. *See* 35 P.S. § 780–141.1 ("Nothing in this act relating to drug paraphernalia shall be deemed to supersede or invalidate any consistent local ordinance ... relating to the possession, sale or use of drug paraphernalia."). The City counters that the state and local enactments simply address different aspects of such sales, with the Act defining what constitutes criminal conduct and the Ordinance banning only localized sales in Philadelphia of dual-use items commonly used as drug paraphernalia. According to the City, the Act and the Ordinance work together in deterring the use, manufacture, and sale of illegal drugs. Moreover, the Ordinance is tailored to a Philadelphia-specific concern that flavored cigarettes and cigars sold in small quantities promote illegal drug use because they are popular with illegal drug users and are readily available throughout the City at tobacco shops, gas stations, and convenience stores. The City also disputes appellants' belief that the Act speaks to, or protects by implication, the economic

interests of appellants in selling the items listed in Sections 622(5)(a)(.1), (.4), and 629(2).

The Majority sustains appellants' position and declares the Ordinance invalid. The Majority reasons that the Act recognizes that items commonly used as drug paraphernalia also have legitimate uses, and the General Assembly chose not to prohibit or penalize persons from selling dual-use items for such legitimate purposes.[2] Only persons who sell dual-use items knowing that they will be used as drug paraphernalia commit a crime under the Act. By comparison, the Majority describes the Ordinance as punishing all sales of dual-use items, regardless of the seller's intent and essentially creating strict liability offenses. Against this background, the Majority, opting for a very narrow approach to conflict preemption, poses the question as whether the Act and the Ordinance are in conflict because the first requires *mens rea* while the second does not. Relying foremost on *Mazzo v. Board of Pensions & Retirement*, 531 Pa. 78, 611 A.2d 193 (1992) and *Western Pennsylvania Restaurant Association v. City of Pittsburgh*, 366 Pa. 374, 77 A.2d 616 (1951) (*"Restaurant Association"*), the Majority concludes that the two enactments are in direct conflict and, consequently, that Sections 622(5)(a)(.1), (.4), and 629(2) are preempted by the Act and invalid.[3] According to the Majority, the Ordinance's lack of a *scienter* or *mens rea* element in establishing local civil penalties is inconsistent with the Act's inclusion of such a require-

2. Loosies and flavored tobacco, as defined in the Ordinance, are not included by name in the drug paraphernalia definition of the Act and are, therefore, not among the dual-use items specifically addressed by the state enactment. Nonetheless, appellants raise the same conflict preemption arguments regarding all the challenged provisions of the Ordinance, whether they address loosies and flavored tobacco, § 622(5)(a)(.1), (.4), or they address drug paraphernalia by reference to the Act, § 629(2). As neither party argues to the contrary, like the Majority, I proceed on the assumption that loosies and flavored tobacco are included in the Act's broad definition of "drug paraphernalia" and are, therefore, addressed by the Act. *See* 35 P.S. § 780–102.

3. The Majority also rejects, *inter alia*, the conclusion of the Commonwealth Court that Section 629(2) of the Ordinance is a zoning provision and is therefore saved from preemption by the Act's savings clause, 35 P.S. § 780–141.1. Because I believe that none of the three provisions are preempted, I would not reach this secondary issue.

ment before state criminal liability may attach. Moreover, although conceding that the Ordinance is not an obstacle to accomplishing the primary purpose of the Act (to control the use of illegal drugs, which is a particularly pernicious problem in Philadelphia County), the Majority concludes that the Ordinance nonetheless contradicts what it discerns to be some "implied objective" of the Act to supposedly "protect" those who sell dual-use items for "legitimate" purposes. (Of course, to be candid, under the Majority's approach, the "protection" it infers from legislative silence would encompass not just the "innocent" and the "legitimate," but those who elect to be deliberately blind to the uses that are made of their wares, as well as those who know perfectly well what the uses are, but who take the risk that the police will not catch them; calling such uses legitimate is tautological.) According to the Majority's reasoning from silence, "a seller of a dual-use item for legitimate purposes is protected from any penalty under the Act." Majority Op. at 165, 10 A.3d at 914. I respectfully believe that the Majority's approach fails to apply the governing authority in this area. Indeed, a proper appreciation and application of the prevailing law on conflict preemption leads inexorably to the conclusion that the Majority's holding is mistaken.

## I.

The doctrine of conflict preemption is well established: a local ordinance is invalid to the extent it contradicts or is inconsistent with a state statute. *Mars Emergency Med. Servs., Inc. v. Twp. of Adams*, 559 Pa. 309, 740 A.2d 193, 195 (1999) (*"Mars EMS "*). But unless the conflict between the ordinance and the statute is irreconcilable, "the will of the municipality as expressed through [the] ordinance will be respected." *City Council v. Marcincin*, 512 Pa. 1, 515 A.2d 1320, 1326 (1986) (*"Marcincin "*).

Prevailing caselaw dictates that "local legislation cannot permit what a state statute ... forbids or prohibit what state enactments allow." *Huntley & Huntley, Inc. v. Borough Council*, 600 Pa. 207, 964 A.2d 855, 862 (2009) (*"Huntley "*). Additionally, the local enactment may "not stand as an obsta-

cle to the execution of the full purposes and objectives of the [General Assembly]." *Id.* at 863. But, "where the [General Assembly] has assumed to regulate a given course of conduct by prohibitory enactments, a municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable." *Mars EMS*, 740 A.2d at 195.[4] To be sure, the Majority acknowledges the cases that form the basis of my analysis below; but, I believe the Majority is unsuccessful in attempting to square its conclusion with these nuanced principles.

The proper questions before the Court are whether the Act and the Ordinance are irreconcilable, and whether the Ordinance stands as an obstacle to the execution of the full purposes and objectives of the General Assembly. A careful review of our cases reveals that the challenged Ordinance provisions are not irreconcilable with the Act, nor do they interfere with the objectives of the General Assembly. Indeed, I believe that the provisions of the local enactment are in harmony with the state statute, and further the Act's purpose and the General Assembly's intent.

---

4. In *Huntley*, this Court noted that the doctrine of conflict preemption has traditionally been employed to invalidate state laws that stand in the way of the national Congress's objectives, but that the doctrine also fully applies on an intrastate level, to municipal ordinances that interfere with the operation of state statutes. 964 A.2d at 863, n. 6. Writing for the Court in another case, Mr. Justice Saylor explained the conflict preemption doctrine in the traditional context:

> [I]n conflict preemption, Congress'[s] intent to preempt is inferred where there is an actual conflict between state and federal law. Such a conflict arises where compliance with both state and federal laws or regulations is an impossibility or where state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress.

*Council 13, Am. Fed'n of State, County & Mun. Employees v. Rendell*, 604 Pa. 352, 986 A.2d 63, 81 (2009) (citing *Hillsborough County v. Automated Med. Labs.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)); *see Dooner v. DiDonato*, 601 Pa. 209, 971 A.2d 1187, 1198 (2009) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) and *Barnett Bank v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)).

## II. A

The first point of dispute is whether the Act and the Ordinance are in direct conflict, as appellants claim, or whether they are in harmony, as the City argues. Generally, an irreconcilable conflict exists where simultaneous compliance with both the local and state enactments is impossible. *See Council 13, Am. Fed'n of State, County & Mun. Employees v. Rendell,* 604 Pa. 352, 986 A.2d 63, 81 (2009) (*"Council 13"*); *Mazzo,* 611 A.2d at 195–97. Conversely, an ordinance that collaterally touches upon a given course of conduct regulated by a state statute, but does not confront affected persons with a choice of obeying one enactment over the other, is not directly in conflict with a state enactment. *See Nutter v. Dougherty,* 595 Pa. 340, 938 A.2d 401 (2007); *Mars EMS,* 740 A.2d 193; *Marcincin,* 515 A.2d 1320, *Dep't of Licenses & Inspections v. Weber,* 394 Pa. 466, 147 A.2d 326 (1959) (*"Weber"*). Among relevant types of ordinances that this Court has found valid against a conflict preemption challenge are enactments that added locally-tailored conditions to broad state pronouncements on a given course of conduct, and ordinances that defined prerequisites for operating a business in the municipality which exceeded the licensing requirements imposed by the state statute. Further analysis of the cited cases is helpful to illustrate and explain these principles.

In reaching its conclusion that the Ordinance is preempted, the Majority refers to *Mazzo* as a "relevant" example of conflict preemption. But, *Mazzo* is distinguishable and inapposite. The statute at issue there, the Public Employee Pension Forfeiture Act ("PEPFA"), set forth a clear mandate that a public employee charged with criminal misconduct and discharged from his position, but who was later acquitted of the criminal charge, "shall be entitled to all" pension fund benefits he had earned while employed. 611 A.2d at 195. Philadelphia's ordinance in that case, however, required not only acquittal but also reinstatement to employment before the former employee could recover his pension benefits. This Court concluded that the additional requirement of reinstatement was in direct conflict with the General Assembly's

mandate that benefits "shall be" restored upon acquittal, and acquittal only. *Id.*

Accordingly, the *Mazzo* Court held that Philadelphia's ordinance was preempted by PEPFA. The Court stated that the municipality had no authority to impose the additional conditions for the payment of pension benefits: "Given the legislature's directive that benefits **shall** be paid when individuals have been acquitted or otherwise absolved of criminal charges, it is not possible to uphold a municipal ordinance declaring the benefits **shall not** then be paid." 611 A.2d at 195–97 (emphasis in original).[5] *Mazzo,* of course, is a classic example of a case in which an ordinance is preempted because the local and state enactments are simply irreconcilable. The local entity sought to supplant the requirements for reinstatement to pension benefits designed by the General Assembly, and compliance with both the ordinance and PEPFA was an impossibility. *See Council 13, supra,* 986 A.2d at 81.

In contrast, where the local ordinance merely adds conditions—not foreclosed by the state statute—on the conduct regulated by the General Assembly, the municipal enactment has generally been deemed valid. For example, in *Marcincin,* the state and local enactments both governed eligibility for reelection to mayoral office. The municipality enacted a term limit ordinance and the Court upheld it as a restriction on reelection not foreclosed by the plain language of the Election Code. 515 A.2d at 1321–26.

The relevant Election Code provision stated that a city's elected officers "shall be eligible [for] reelection." *Id.* at 1321 n. 1 (quoting from P.L. 932 of June 23, 1931, art. VII, § 703, 53 P.S. § 35701). The City of Bethlehem passed an ordinance directing that the mayor "shall be eligible to succeed himself for only one additional term." *Id.* The incumbent mayor, whose entitlement to office after election to a third term was

5. Further, the Court concluded that the local ordinance frustrated and undermined the goals of PEPFA—which were to prevent unjust forfeiture of pension benefits and ensure uniformity of benefits within the pension system—by setting apart Philadelphia's legal regime governing pension reinstatements from that applicable in the rest of the Commonwealth. *Mazzo,* 611 A.2d at 196.

being challenged, argued that the statewide enactment required unrestricted perpetual reelection rights, and that the local term limit was in conflict and invalid. But, the Court rejected the incumbent's argument, finding no conflict and no preemption. According to the Court, if the ordinance had fully prohibited reelection of an incumbent, then the conflict would be "obvious." *Id.* at 1323. However, because nothing in the statutory language "indicate[d] that the term 'reelection' connotes an infinite number of successive opportunities of election to the same municipal office," the local enactment was not in patent discord with the Election Code. *Id.* The Court concluded that the state and local provisions were "in harmony," and not irreconcilable. *Id.* at 1321, 1326.

*Marcincin* is instructive because the local and state enactments therein both addressed a rather narrow issue, mayoral reelection, and the local ordinance did not track the language of the Election Code. The Court, however, did not invalidate the ordinance on that basis but looked for indicia that the General Assembly had intended to foreclose local regulation of the even narrower sub-issue of term limits, which was the precise subject of the local enactment. Unlike in *Mazzo*, compliance with the local regulation in *Marcincin* did not make compliance with the state statute impossible, and the ordinance was upheld.

Similarly, and of far more relevance here than *Mazzo*, is a case such as *Weber, supra*. In *Weber*, this Court upheld the validity of a Philadelphia ordinance which required "beauty salons" to obtain, as a prerequisite to operation, a local business license in addition to the mandatory state license. 147 A.2d at 327. To obtain the local license, salons were required to comply with greater cleanliness standards than were set forth in the state statute, the Beauty Culture Act (the "BCA"). For example: while the BCA prohibited use of any beauty shop for residential purposes, the Philadelphia ordinance went farther and required a solid partition between the shop and any room used for habitation; also, the BCA generally required tools to be sterilized, but the Philadelphia ordinance specified the sterilization temperature and chemi-

cals to be used; and, the Philadelphia ordinance prohibited beauty shop operators from smoking on the job, while the BCA did not address the issue. *Id.* at 330–31.

Certainly, the stricter standards in Philadelphia increased the operating costs and erected additional barriers to entry into the beauty salon market. The Court, however, did not factor economic concerns of beauty salon owners into its analysis of whether the local ordinance was preempted; nor did the Court suggest that the outer contours of the BCA acted as a protective shield against greater local regulation of a business. Rather, the primary focus was on whether the Philadelphia ordinance followed "the broad outlines of the mother legislation" and whether the enactment promoted the General Assembly's objectives as expressed in the BCA. *Id.* at 329. The Court held that the local regulation met these conditions and stated that "stricter and more rigid" regulation of beauty salons in large cities was to be expected because of the special challenges posed by having to ensure "the health, safety, welfare, and comfort of dwellers in urban centers" compared to the state as a whole. *Id.* (citing 37 Am.Jur. Mun. Corps., § 276 at 898–99). According to the Court, the stricter local enactment strengthened and added to "the straws of the statutory broom," and promoted the General Assembly's purpose of safeguarding the health of the public. *Id.* at 330. The *Weber* Court thus found that no direct conflict existed between the local and state enactments even though Philadelphia had added stricter licensing conditions than the state. The opponents of the *Weber* ordinance argued, just as appellants argue here, that the local licensing was duplicative and imposed barriers not contemplated by the General Assembly, but the Court rejected this argument, stating that the state statute did not foreclose local ordinances like Philadelphia's but rather encouraged them. *Id.* at 328.

Essentially, the *Weber* ordinance devised local licensing requirements that were parallel to those of the state. Local licensing was based on stricter standards justified by local conditions. Additionally, like the *Marcincin* ordinance, the *Weber* enactment did not track the state statute, but was

nonetheless deemed valid based on a nuanced consideration of the state statutory scheme and the goals of the General Assembly.

These same considerations come into play where the municipality regulates a course of conduct tangentially related to, but not specifically addressed by, the state statute. The complexity of the analysis in these circumstances is evident from a recent case, *Nutter*, 938 A.2d 401. In *Nutter*, a candidate for Philadelphia Mayor sought to enforce a local ordinance regulating campaign spending against his opponents and the opponents responded by challenging the ordinance on grounds of conflict preemption and field preemption.[6] According to the opponents, the State Election Code comprehensively addressed a plethora of election-related activities, but did not impose specific campaign finance limitations in local elections. In an argument that is similar to appellants' argument here, the opponents in *Nutter* interpreted this silence to mean that the General Assembly implicitly disapproved of such limitations, and that the Philadelphia ordinance thus directly conflicted with the Election Code and was invalid. This Court rejected the opponents' interpretation and decided there was no preemption:

Far from proving [the opponents'] point, ... th[e] enumeration of statutorily controlled activities conversely suggests that when an Election Code so comprehensively deals with certain subjects yet fails materially to address itself to campaign contribution limits—especially where that omission is not identified as a function of legislative design to leave unfettered all such matters—it all but compels the

6. The question of field preemption, which is an inquiry into whether the General Assembly intended to occupy the entire legislative area, leaving no room for supplementary local legislation, is not at issue in this case. The plain language of the Act does not allow for any such claim. *See* 35 P.S. § 780–141.1 ("Nothing in this act relating to drug paraphernalia shall be deemed to supersede or invalidate any consistent local ordinance, including zoning or nuisance ordinances, relating to the possession, sale or use of drug paraphernalia."); *see also Mars EMS*, 740 A.2d at 195 (according to field preemption doctrine, "absent a clear statement of legislative intent to preempt, state legislation will not generally preempt local legislation on the same issue").

inference that the legislature, in fact, intended not to foreclose local regulation of campaign contributions for local elections.

*Id.* at 416. Although the *Nutter* Court construed the opponents' argument as regarding field preemption, the Court's decision is clear that silence of a statewide enactment on a given course of conduct is not a form of tacit disapproval by the General Assembly of future and further local regulation of the same conduct. *Accord Mars EMS,* 740 A.2d at 196 (comprehensive state statute addressing emergency medical services did not preempt local ordinance designating one primary provider of emergency medical services in township, where such designation was not prohibited or addressed by state enactment).

The *Nutter* decision clarified earlier jurisprudence by holding that the General Assembly's silence on an issue does not foreclose local regulation of the given course of conduct. This conclusion easily fits within the larger scheme of the conflict preemption doctrine, in which locally-tailored ordinances are favored where they reinforce the purposes of the related state statute. *See, e.g., Weber,* 147 A.2d at 330 (Justice Musmanno, writing for the majority, stated that the court below should have "compared the broom of the state statute with the broom of the city ordinance . . . [and] it would have found not only that many of the straws of the statutory broom had been strengthened, but that new ones had been added, all to the end that cleanliness should be served, sanitation enhanced, and health more certainly preserved."). The main considerations for the *Nutter* Court were whether the local enactment created an obvious rather than an implied conflict with the statutory language and whether the local ordinance furthered the purpose of the statute.

In my view, *Weber, Marcincin,* and *Nutter* are more directly relevant than *Mazzo* and those cases should control the outcome of this case. The caselaw obviously disfavors the simple, mechanical comparison of the local and state enactments and the automatic rejection of local regulatory schemes that are not identical to statewide statutes. Indeed, such an approach leaves little room for legislating to account for local

variations. Instead, until today, our conflict preemption juris-prudence has followed settled principles and counsels in favor of a restrained, nuanced, and common sense approach. The essential question in the analysis of an alleged direct conflict is the practical one of whether it is possible for affected persons to comply with both the state and local regulations. If the answer is no, then the local enactment is preempted and invalid. If the answer is yes, then the next inquiry is whether the ordinance stands as an obstacle to fulfilling the purposes of the state law. In my view, the Majority's analysis of the relevant questions is superficial, conclusory, and unpersuasive.

## II. B

With respect to the Act and the Ordinance in the case *sub judice*, the answer to the question above plainly is yes, for the following reasons. The Act prohibits knowing delivery, pos-session and manufacture of drug paraphernalia. It is a penal statute that, *inter alia*, defines what constitutes criminal behavior in relation to drug paraphernalia and thus provides fair notice of the prohibited activities before a citizen may face criminal sanctions. *See Village of Hoffman Estates, Inc. v. Flipside*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("*scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice"); *Common-wealth v. McCoy*, 599 Pa. 599, 962 A.2d 1160, 1169 n. 11 (2009) (failure of statute defining criminal conduct to give fair notice of conduct deemed criminal raises due process concerns); *Commonwealth v. Teeter*, 961 A.2d 890, 897 (Pa.Super.2008) (penal statute defines criminal offenses and specifies corre-sponding fines and punishment). The City's Ordinance, on the other hand, is legislation that merely bans the sale in Philadel-phia of certain items, like loosies, flavored tobacco, and dual-use items. The Ordinance is enforced via civil penalties, such as fines and suspension of a retailer's City-issued business license. *See Plowman v. Commonwealth*, 535 Pa. 314, 635 A.2d 124, 127–28 (1993) (suspension of driver's license pursu-ant to Crimes Code, following guilty plea to drug possession unrelated to operation of vehicle, is not criminal punishment but "civil consequence" intended to deter criminal behavior).

As in *Weber* (separate local and state business licensing) and *Nutter* (separate local and state campaign finance rules), the local and state enactments here act in parallel and target different, albeit related, courses of conduct: the Act sets out the statewide prerequisites necessary for criminal conviction for drug paraphernalia-related crimes; the Ordinance, on the other hand, sets out a sales ban in Philadelphia on certain tobacco products and dual-use items, enforced with separate civil penalties. Of course, the course of conduct targeted by the provisions entails the same physical act—the sale of a dual-use item—and, thus, they are related. But, the targeted conduct manifestly is different, for purposes of a principled conflict preemption analysis, because the Act criminally punishes the sale of drug paraphernalia (*i.e.,* the sale of a dual-use item with knowledge that it will be used to propagate use of illegal drugs), while the Ordinance burdens, and thereby discourages, the sale of dual-use items via civil penalties. To answer the Majority simply, the conduct criminally proscribed by the Act is the sale of drug paraphernalia, while the conduct burdened and penalized by the Ordinance is the sale of dual-use items.

Moreover, the state and local enactments act in parallel, as the fines and business license consequences of violating the Ordinance are in addition to, not in lieu of, the Act's criminal penalties; they are civil consequences of behavior that, in circumstances described by the Act, may also be punished criminally. *See Plowman, supra,* 635 A.2d at 127–28. The Ordinance does not purport to remove—and does not even address—the *mens rea* or *actus reus* requirements for criminal conviction under the Act; it merely describes what amounts to a violation of a local Ordinance, with attendant civil consequences.

It is not impossible for an individual to comply with both the state and the local regulation. Because the two enactments target different conduct with different consequences, the Majority's conclusion that the Ordinance is preempted because of a supposed "discrepancy with respect to *mens rea* for a

particular course of proscribed conduct" describes an ephemeral tension. *See* Majority Op. at 165, 10 A.3d at 913. As noted, the Ordinance is a sales ban aimed at particular, locally-relevant dual-use items. A review of the Act shows that economic or commercial interests of dual-use items retailers, which the Ordinance regulates, are never specifically addressed. The Act specifically addresses only the criminal activity of all persons, including retailers of dual-use items, relating to knowing delivery of drug paraphernalia, but it does not address or purport to shield their economic or commercial interests relating to sales of dual-use items. *Compare Mazzo* (statute specifically addressed prerequisites for pension reinstatement with mandatory language, and ordinance modified these prerequisites; ordinance was preempted) *with Marcincin* (statute created reelection right but did not specify number of terms, and local ordinance set term limits; ordinance was valid). To the extent the same conduct constitutes violation of both enactments, the two provisions create no Hobson's Choice for dual-use item purveyors and are therefore in harmony.

Appellants attempt to overcome this conclusion by arguing that the Act's failure to criminalize the *scienter*-free sale of dual-use items for lawful purposes reflects the General Assembly's deliberate intention to allow such sales without restriction and presumably protect the commercial interests of retailers throughout the state. *See* Appellants' Brief at 32–46.[7] The Majority agrees and states that "the General Assembly was far from silent as to the *mens rea* element" and therefore conflict preemption analysis requires that we infer that the General Assembly must have intended to protect purveyors of dual-use items for "legitimate"[8] purposes "from any penalty."

7. To the extent that appellants argue that the Ordinance is an unreasonable restraint on sales of dual-use items that supposedly destroys the tobacco industry and appellants' businesses in Philadelphia, that argument is better suited to support vagueness or overbreadth legal arguments—questions of constitutionality—rather than of application of the conflict preemption doctrine. The constitutionality of the Ordinance is not before us, and I offer no view on the strength of those arguments.

8. As I have noted earlier, there is a tautological element to labeling these uses as "legitimate." They are "legitimate" only because they are

Majority Op. at 165, 10 A.3d at 913–14. But, these premises are too broad and also incorrect: the Act creates a *mens rea* prerequisite for criminal conviction purposes only. *See* 35 P.S. § 780–113(a)(33). The Act's *mens rea* requirement provides fair notice of the prohibited activity before criminal sanctions are imposed, to protect the due process rights of persons within the purview of the Act. *See McCoy*, 962 A.2d at 1169 n. 11. As Judge Cohn Jubelirer stated in dissent below, the explicit target of the City's Ordinance—prohibiting the sale of certain items—"obviates the need" for a *scienter* requirement. 952 A.2d at 1213. By contrast, "the *scienter* provision of the Act is necessary to protect retailers and others who, given the Act's lack of precision, may genuinely be unsure as to whether an item they are selling is contraband." *Id.*

That is the extent of the protections explicitly afforded by the Act. Simply because the Act criminalizes only knowing delivery of drug paraphernalia dual-use items, it is not logical to conclude that, as a corollary, the Act affirmatively "protects" all commercial interests of retailers in sales of dual-use items—whether those retailers are wholly innocent or strategically blind to the uses. And, notably, given that the statute specifically describes in no uncertain terms that "[n]othing in this act relating to drug paraphernalia shall be deemed to supersede or invalidate any consistent local ordinance ... relating to the possession, sale or use of drug paraphernalia," 35 P.S. § 780–141.1, the Majority's reliance on the Act's silence as conveying a fixed and global intention to affirmatively shield the commercial conduct of all dual-use purveyors is misplaced. Indeed, if the General Assembly truly had intended to provide the non-nuanced commercial protection described by appellants, it could easily have said so explicitly rather than implicitly embedding such an important shield against local regulation into a criminal statute. *Nutter*, 938 A.2d at 416 (when a statute comprehensively deals with certain subjects yet fails materially to address itself to others, "especially where that omission is not identified as a function

not governed by the criminal statute; but there is a wide range of varying moral behavior encompassed.

of legislative design to leave unfettered all such matters—it all but compels the inference that the legislature, in fact, intended not to foreclose local regulation").

## II. C

The Majority fails to engage the multiple facets of this Court's decisions in *Weber, Marcincin,* or *Nutter,* and instead relies primarily on *Mazzo* to conclude that the Ordinance and the Act are in direct conflict.[9] But, against the fuller background of our conflict preemption caselaw, it is apparent that *Mazzo* is distinguishable.

The Act and the Ordinance do not overlap in application and have no conflicting effect comparable to the enactments in *Mazzo.* Instead, *Weber, Marcincin,* and *Nutter* offer more apt comparisons. In all three cases, the local enactment changed the legal regime at the municipal level in a complementary manner, either by creating more detailed and stricter standards of conduct, or by regulating courses of conduct not addressed by comprehensive state statutes. Similarly, here, Philadelphia regulated a course of conduct left unregulated by the state: the economic consequences for retailers and other persons selling loosies, flavored tobacco, and other dual-use items, which are commonly put to use in the drug trade in Philadelphia. *See Weber, supra (e.g.,* standards for sterilization, smoking in beauty shops); *Nutter, supra (e.g.,* campaign contribution limits in local elections). The Act, a penal statute, did not foreclose such complementary regulation and, in

9. The Majority also cites this Court's sixty year-old opinion in *Restaurant Association* as support for its conclusion that the Ordinance is preempted. Majority Op. at 157–58, 164–65, 10 A.3d at 909, 913. But, *Restaurant Association* does not shed any greater light than more recent precedent in this area of law. *Restaurant Association's* analysis of the local ordinance provisions which were invalidated is limited to the following: "some of the provisions of the ordinance are inconsistent with those of the 1945 Act. For example, the penal provisions of the ordinance are more drastic, and the fines to be imposed for violations are made payable to the city instead of, as in the statute, to the county where the restaurant is located. Where such minor discrepancies exist the provisions of the statute and the rules and regulations adopted thereunder must, of course, prevail...." 77 A.2d at 620.

fact, invited it through its savings clause. *See* 35 P.S. § 780–141.1.

## III.

As I would find that no direct conflict exists between the Ordinance and the Act, I now address the second consideration in conflict preemption analysis: whether the local enactment stands "as an obstacle to the execution of the full purposes and objectives of the [General Assembly]." *Huntley*, 964 A.2d at 863. Here, the Act's apparent purpose is, *inter alia*, to control the use and distribution of illegal drugs. *See id.* at 864 (unless statute provides otherwise, its purpose may be gleaned from its substantive provisions). The Majority concedes that this is the "primary purpose of the Act," but insists that the state statute has an additional, implied purpose, to "protect" purveyors of dual-use items for "legitimate" purposes from "any penalty," criminal or otherwise. Majority Op. at 164–65, 10 A.3d at 913–14.

Respectfully, for the reasons I have already stated, I disagree that the legislative silence conveys such a loud, clear, unambiguous, and non-nuanced signal—especially in an area, like this one, where there are many gradations of conduct shy of the overtly criminal. The General Assembly has never indicated, by plain language or necessary implication, any intention to extend protection to such sellers beyond what is required by due process for criminal conviction under the Act. *See McCoy, supra.* Moreover, the broad protection against "any penalty" that the Majority discerns in the legislative silence may have unintended consequences, such as inviting a preemption challenge to local taxation of dual-use items. The Majority's rule suggests that every local ordinance regulating, or burdening the sale of, dual-use items such as cigars and other tobacco products, is automatically in conflict with the Act which, via the Majority's approach to conflict preemption, now occupies the field.

If this were not enough, the consequences of the Majority's approach create a direct—not a silent or "implied"—conflict

with the Act's savings clause. The General Assembly explicitly made clear its expectation that municipalities might supplement the Act's provisions with locally-tailored, complementary regulations "relating to the possession, sale or use of drug paraphernalia." *See* 35 P.S. § 780–141.1. The Majority provides no explanation for giving controlling prominence to the protective purpose it derives from the Act's silence over the Act's admittedly "primary" goal of controlling the use and distribution of illegal drugs, and explicitly stated intention of permitting locally-tailored regulations which further this goal. The "sounds of silence" the Majority would follow must stand down to the legislative alarum.

Here, the goal of the Philadelphia Ordinance is fully congruent with the Act's purpose. The Ordinance targets dual-use items often used locally as drug paraphernalia, and seeks to provide disincentives for their distribution in the form of civil penalties. The items identified by the City as being closely related to drug use name a broad array of dual-use items, and include loosies and flavored tobacco in addition to the items specifically listed by the Act. The more expansive and locally-tailored reach of the Ordinance, however, is not a basis upon which to conclude that the municipality acted contrary to the General Assembly's intent. *Nutter, supra* (legislative silence not indicator that local legislation is foreclosed). In *Weber*, we recognized the salutary effect of specifically tailored local legislation which promotes the larger purpose of the statewide enactment. Philadelphia's Ordinance is this type of local enactment. According to the City, the local Ordinance addresses the peculiar local problems of (1) criminal enforcement of the Act when retail establishments that sell dual-use items are pervasive in a large city with an overburdened police force; and (2) readily available, cheap, loose and flavored tobacco products being used to ingest a controlled substance. In this sense, the Ordinance provisions regarding loosies and flavored tobacco further the Act's purpose by making it more difficult to obtain those specific items and discouraging a specific kind of illicit drug use. It is not our task to evaluate the wisdom of the Ordinance, but simply

to determine whether the General Assembly contemplated a role for local government in adopting such a measure, in its own judgment. In my judgment, the General Assembly did so contemplate.

## IV.

In my view, Sections 622(5)(a)(.1), (.4), and 629(2) of the Ordinance are not preempted by the Act. The Ordinance is a permissible, consistent local enactment addressing the problem of drug paraphernalia propagation. Consistency between state and local laws does not require that the General Assembly and the municipality enact an identical scheme. It is sufficient that the local and state enactments address different courses of conduct harmoniously and may be enforced simultaneously. Further, the Ordinance advances the Act's purpose by making it more difficult to obtain certain drug paraphernalia and thus discourages illicit drug use, particularly with respect to a type of drug use apparently prevalent in the City.[10] Because I would uphold the Ordinance against the instant conflict preemption challenge, and because the Majority's analysis is contrary to our governing precedent, I respectfully dissent.[11]

Justices TODD and ORIE MELVIN join this opinion.

---

**10.** In principle, as a matter of policy, I agree with the sentiments expressed by Justice Saylor that an effective sales ban such as the one at issue here, adopted as a means to discourage collateral illegal drug use in Philadelphia, "goes too far." Concurring Op. at 166–67, 10 A.3d at 914–15 (Saylor, J., concurring). I also recognize the potential persuasiveness of these arguments for invalidating the Ordinance under some of the other legal theories offered by appellants to the trial court, but which the trial court did not reach after finding preemption. Those theories are not before us here. The question before us is conflict preemption, and consideration of whether the municipality pursued the best means to accomplish its stated purpose is not a salient factor in that analysis. Whether one enjoys cigars or not, for conflict preemption analysis, a cigar is just a cigar.

**11.** I note that the U.S. Supreme Court recently accepted review in three cases involving the doctrine of preemption: *Bruesewitz v. Wyeth, Inc.,* (argued October 12, 2010); *Williamson v. Mazda Motor of Am., Inc.,* (argued Nov. 3, 2010), and *Chamber of Commerce v. Whiting,* (argued Dec. 8, 2010). *Whiting,* in particular, raises a conflict preemption issue

similar to the one before us. The two questions relevant here on which the Court granted certiorari are: "[w]hether the Arizona statute, which requires all employers to participate in a federal electronic employment verification system, is preempted by a federal law that specifically makes that system voluntary" and "[w]hether the Arizona statute is impliedly preempted because it undermines the comprehensive scheme that Congress created to regulate the employment of aliens."